UNITED STATES of America,
Plaintiff–Appellee,

v.

Leticia CASTANEDA, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Ismael BARRON, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Maria MERAS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Uriel CASTANEDA, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Terezo de Jesus UMANSOR–ALVAREZ,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Lucas ORNELAS–MARTINEZ
(True Name: Jose Licea),
Defendant–Appellant.

Nos. 92–30077, 92–30095 to 92–30097,
92–30102 and 92–30103.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1993.

Decided Oct. 5, 1993.

As Amended Oct. 26, 1993.

Walter G. Palmer, Peggy Sue Juergens, Seattle, WA, for defendant-appellant Leticia Castaneda.

Allan B. Ament, Bellevue, WA, for defendant-appellant Ismael Barron.

Antonio Salazar, Salazar Law Offices, Seattle, WA, for defendant-appellant Maria Meras.

Erik L. Bauer, Bauer, Parsons & Campbell, Tacoma, WA, for defendant-appellant Uriel Castaneda.

Peter A. Camiel, Mair, Abercrombie, Camiel, and Rummonds, Seattle, WA, for defendant-appellant Terezo de Jesus Umansor-Alvarez.

Allen Ressler, Seattle, WA, for defendant-appellant Lucas Ornelas–Martinez.

Ron Friedman, Ken Bell, Asst. U.S. Attys., Seattle, WA, David T. Shelledy, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before: WRIGHT, FARRIS and D.W. NELSON, Circuit Judges.

## OPINION

D.W. NELSON, Circuit Judge:

### OVERVIEW

This consolidated appeal is brought by eleven individuals involved in an extensive conspiracy to distribute cocaine and heroin. Appellants raise a multitude of issues, the majority of which are considered in a separate, unpublished disposition. Our concern here is with appellants' appeals from their jury convictions for use of a weapon in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and with Terezo De Jesus Umansor–Alvarez's ("Umansor–Alvarez") and Lucas Ornelas–Martinez's ("Ornelas–Martinez") appeals from their sentences. We reverse six of seven of Leticia Castane-

da's ("Leticia")[1] firearm convictions and affirm all of Uriel Castaneda's ("Uriel"), Maria Meras' ("Meras") and Ismael Barron's ("Barron") firearm convictions. We remand Umansor–Alvarez's case for findings with respect to his sentence; we affirm the sentence of Ornelas–Martinez.

## FACTUAL AND PROCEDURAL BACKGROUND

Beginning in August of 1989, the Drug Enforcement Agency ("DEA"), the Seattle police, and the Los Angeles police began three unrelated investigations into appellants' drug activities. These investigations uncovered an extensive heroin and cocaine distribution network. Barron was at the center of the network acting as both a supplier and a distributor. Barron used Uriel and Basilio Angulo–Lopez ("Angulo–Lopez") as alternative suppliers. Below Barron, Uriel, and Angulo–Lopez, there were numerous distributors including Ornelas–Martinez. Umansor–Alvarez was a small-time dealer whom Uriel supplied with drugs. Meras, Barron's common law wife, acted as his assistant. Victor Castaneda ("Victor"), Uriel's brother, and several other Castaneda family members played strong supporting roles in his organization. The role of Leticia, Uriel's wife, was slight.

The first investigation targeted Angulo–Lopez. In November 1989, the DEA began a separate undercover investigation of Barron and Meras; the investigation included a wiretap of their home telephone. In May 1989, a separate undercover investigation of the Castaneda family began after the Los Angeles police received information that Uriel and his brother Rafael Castaneda ("Rafael") ran a distribution organization which had connections in Los Angeles and Seattle.

At some point in September 1990, the investigations of Angulo–Lopez and Barron were merged. On the basis of information obtained through the Barron wiretap and other sources, the Seattle police and the DEA conducted searches, pursuant to a warrant, of several of appellants' residences. Several low-level distributors were arrested

as a result. Barron's intercepted conversations partially provided the basis for permission to monitor the Castaneda home telephone. Three-hundred-and-sixty phone calls were intercepted involving Leticia; six of them provided the basis for the charges against her in this case.

DEA agents conducted a series of searches of Angulo–Lopez's residences and storage lockers, uncovering a large amount of drugs and several weapons in October 1990. The agents subsequently arrested Angulo–Lopez. A few days later, authorities conducted a second series of searches of Uriel's "stash houses" and residences, and they arrested him and some of his relatives. In December 1991, a superceding indictment merged the Angulo–Lopez/Barron and Castaneda cases. After a lengthy jury trial, the eleven appellants were convicted of conspiring to distribute cocaine and heroin in violation of 21 U.S.C. § 846 and a variety of other drug related charges. Appellants were sentenced under the United States Sentencing Guidelines ("the Guidelines"), although many also were subject to statutorily mandated minimum terms.

## DISCUSSION

### I. Firearm Convictions

Leticia and Uriel were convicted of seven counts and Meras and Barron were convicted of five counts of using a firearm in violation of 18 U.S.C. § 924(c) on the basis of co-conspirator liability. The predicate offense for one count was the conspiracy itself, while the predicate offenses for the remaining counts were possession with intent to distribute offenses involving other defendants. These four appellants make several challenges to their firearm convictions which we discuss in turn.

### A. Consolidation of Firearm Counts

■ Leticia argues that the district court wrongly denied her pre-trial motion to eliminate all but one of the seven firearm charges against her on the ground that the

1. Because several of the appellants and others involved in this case have the same last name, Castaneda, we refer to them by their first names to avoid confusion.

counts were multiplicative. We review *de novo* the district court's ruling. *United States v. Douglass,* 780 F.2d 1472, 1477 (9th Cir.1986). 18 U.S.C. § 924(c) provides that:

Whoever, during and in relation to any crime of violence or drug trafficking ... uses or carries a firearm shall in addition to the punishment provided for such crime of violence or drug trafficking crime be sentenced to imprisonment for five years.

There are two distinct elements to a § 924(c) violation: the carrying of a *firearm and* the *predicate* drug trafficking *offense* in relation to which the firearm is utilized. When there are multiple § 924(c) charges, the indictment must tie each firearm charge to a separate offense. *United States v. Smith,* 924 F.2d 889, 894 (9th Cir.1991).

■■■ Thus, an indictment is multiplicative if the same offense *and* the *same* underlying facts that form the basis for that offense are used to support more than one firearm count. *Id.* at 894. However, if the elements of the two predicate offenses are different, each may form the basis of a firearm count notwithstanding that both offenses stem from the same set of facts. *United States v. Fontanilla,* 849 F.2d 1257 (9th Cir. 1988) (because murder of one person and assault of another in *same episode* were properly charged as separate crimes, it was permissible to charge defendant with two separate firearm counts). Similarly, a defendant may properly be charged with committing the same offense more than once as long as each count depends on a different set of predicate facts.

■■■ Under the rule first pronounced in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), each conspirator is liable for the criminal act of a co-conspirator if: 1) the substantive offense was committed in furtherance of the conspiracy, and 2) the offense could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement. *Id.* at 647–48, 66 S.Ct. at 1184; *Douglass,* 780 F.2d at 1476. A conviction under § 924(c) may be based on *Pinkerton.* *United States v. Johnson,* 886 F.2d 1120, 1123 (9th Cir. 1989), *cert. denied,* 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). Thus, a con-

spirator may be held vicariously responsible for her co-conspirator's carrying of a firearm in *relation to* a specified drug trafficking offense.

■■■ Although Leticia was charged with committing the same predicate possession offense six times, each offense depended on a separate set of facts. Counts 52, 56, and 58 charged use of a firearm in relation to Angulo–Lopez's possession offenses; count 68 was tied to Umansor–Alvarez's possession offense; count 72 was tied to Ornelas–Martinez's possession offense; and count 21 was tied to Victor's possession offense. While the proof at trial overlapped to some degree, each predicate offense relating to Leticia's firearm counts required proof of a different set of facts. Accordingly, the firearm charges against her were not multiplicative.

### B. *Jury Instructions*

Next, Leticia challenges the jury instructions concerning the elements of co-conspirator liability in relation to § 924(c). She makes two arguments. First, she contends that it was improper for the court to instruct the jury that she could be convicted of seven firearm counts under a theory of co-conspirator liability since each count did not depend on a separate predicate offense. This is virtually the same argument as her earlier argument regarding her motion to eliminate all but one of the firearm charges, and, thus, we reject it as well.

Leticia also argues that the jury instructions misstated the law of co-conspirator liability insofar as they allowed not only her responsibility for her co-conspirator's use of a weapon to be based on vicarious liability, but also allowed her responsibility for the predicate offenses to be based on vicarious liability. She argues that this is impermissible insofar as it extends the concept of foreseeability, the touchstone of co-conspirator liability, beyond the limits of fundamental fairness. The question of whether liability for the *predicate offense prong,* as well as the weapon prong, of § 924(c) may be based upon foreseeability alone presents a novel

question of law.[2] We need not, however, decide this question. Assuming, under *Pinkerton,* that responsibility for both the predicate offense prong and use of a weapon prong of § 924(c) may be established on the basis of foreseeability alone, in Leticia's case, foreseeability has been stretched beyond the limits of due process.

### C. *Due Process Limits of Pinkerton*

■ Although Leticia has not framed her challenge in due process sufficiency of the evidence terms, this court has the authority, "especially in criminal cases ... [to] notice errors to which no exception has been taken, if the error's are obvious, or if they otherwise seriously affect the fairness, integrity or public relations of the judicial proceeding." *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1935).

■ Several circuits, including this one, recognize that due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight. *Johnson,* 886 F.2d at 1123; *United States v. Chorman,* 910 F.2d 102, 112 (4th Cir.1990); *United States v. Moreno,* 588 F.2d 490, 493 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979); *United States v. Alvarez,* 755 F.2d 830, 850–51 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). *See also United States v. Christian,* 942 F.2d 363, 367 (6th Cir.1991) (recognizing limitation's existence in other circuits), *cert. denied,* —— U.S. ——, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992). "The foreseeability concept underlying *Pinkerton* is also the main concern underlying a possible due process violation." *Christian,* 942 F.2d at 367. Leticia's firearm convictions under § 924(c) raise the question of whether the due process line has been crossed here. We hold that it has.

When the conspiracy is *not* the predicate offense in a § 924(c) case, the question of foreseeability is more involved than usual. The question is, was it reasonably foreseeable to the defendant that a firearm would be used *in relation to the predicate offense?* *See, e.g., Lucas,* 932 F.2d at 1219.

No circuit has yet found the relationship between a defendant and another conspirator's use of a firearm so remote that due process required reversing a § 924(c) conviction. *Christian,* 942 F.2d at 367. In cases where foreseeability was an issue, however, there was substantial evidence linking the defendant with the predicate offense underlying her § 924(c) conviction. *See Christian,* 942 F.2d at 368 (conspirator's firearm use foreseeable where defendant agreed to participate in predicate drug transaction); *United States v. Gutierrez,* 978 F.2d 1463, 1468 (7th Cir.1992) (same); *Alvarez,* 755 F.2d at 830 (foreseeable because defendants knew of circumstances leading to murder and were present at crime); *Chorman,* 910 F.2d at 105–06 (evidence showed defendants knew and approved of acts underlying predicate offenses of conspirators).

In our *Johnson* case, the defendant was involved actively in a crack house conspiracy: she was there when police broke down the door with a battering ram. During the raid, the police found a gun in the car of a codefendant in the conspiracy. This court held that the gun was foreseeable because "[t]he drug industry ... is a dangerous, violent business." *Johnson,* 886 F.2d at 1123. But a crack house is quite different from the high-level import and distribution operation of the Castaneda clan. Their network was sophisticated, diversified and mobile. There was no need for firearms except during prearranged "deals" (none of which were predicate offenses for Leticia's convictions). A crack house is a fixed-location retail operation, selling small daily amounts of drugs to

---

**2.** The Eighth Circuit has held that specifics of the predicate offense underlying a § 924(c) charge need not be foreseeable to a defendant so long as the general contours of the predicate offense are reasonably foreseeable. *United States v. Lucas,* 932 F.2d 1210, 1220 (8th Cir.), *cert. denied,* —— U.S.——, 112 S.Ct. 199, 116 L.Ed.2d 159 (1991). Thus the Eighth Circuit was concerned with the

level of generality or specificity at which foreseeability operated. The *Lucas* court did not decide whether or not the concept of foreseeability itself was adequate for the predicate offense prong of § 924(c). We note that the *Lucas* appellant was the ringleader of the entire conspiracy. 932 F.2d at 1214, 1219.

dozens of unstable, volatile, desperate street junkies. Potentially it is far more violent each day. Consequently, gun use is very foreseeable.

Although courts recognize the nexus between drugs and firearms, *Johnson*, 886 F.2d at 1123, there is no presumption of foreseeability, *United States v. Gonzalez*, 918 F.2d 1129, 1136 (3d Cir.1990), *cert. denied*, 498 U.S. 1107, 111 S.Ct. 1015, 112 L.Ed.2d 1097 (1991), and the burden of proving foreseeability remains on the government, *id.* Where a defendant has little or no connection to the predicate drug offense, another conspirator's use of a firearm in relation to the predicate drug offense may, in some fact situations, be unforeseeable. In those cases, it would violate due process to find the defendant vicariously liable for the firearm's use under § 924(c). Leticia's situation is a paradigm example of such an unforeseeable use.

As the sentencing court emphasized, Leticia played, at best, a small part in the overall conspiracy. The government contends, however, that six telephone conversations between Leticia and other conspirators demonstrate that she acted as her husband's "assistant" or "confidante" in the conspiracy. Not so. Although she was married to Uriel, a major player, there is no evidence that she played more than a passive role in the drug operation.

The government argues that in one conversation, Leticia sought "assurances" from Meras that Barron wanted to purchase Uriel's drugs. This grossly mischaracterizes that call. In fact, Uriel placed the call, spoke to Meras about a drug transaction, handed the telephone to Leticia, who then began a social conversation with Meras. At one point, Uriel interrupted this conversation, directing Leticia to tell Meras that, if Barron did not want the drugs, he would sell them to someone else. Leticia repeated Uriel's remarks verbatim, then concluded the conversation. This does not show that she "sought assurances" from Meras.

The government also points to two phone conversations between Leticia and a suspected drug dealer, Victor Zamora ("Zamora"). Zamora had called Uriel at home, and each time Leticia told him that her husband was not there. In one call, Zamora asked her several questions about who had called the house and seemed confused by instructions that he had received from Uriel. Leticia engaged in no conversation, offered no help, and answered, in few words, the direct questions put to her about when Uriel would return. In the other conversation, she volunteered that a street-level dealer had been arrested and that a deal involving Uriel had fallen through. This one call is the only evidence of Leticia's active participation: volunteering information about past events and the dealings of others.

The other three calls are inconsequential. In one, Leticia only picked up the phone when it rang and handed it to another family member. In the other two, she spoke to her husband, mostly about family matters and his travel plans. She also answered his questions about who had called or whether a specific person had been arrested. These calls do not indicate that Leticia was much involved in the conspiracy.

Taken together, these phone calls demonstrate that Leticia "assisted" Uriel only insofar as she acted as his spouse: answering her home phone, taking messages from callers and answering his questions when he called. The evidence does not show that she knew much about Uriel's or Barron's organizations, that she knew the low-level distributors involved, that she had any knowledge of Angulo–Lopez's organization, or that she ever had more than a marginal role in the conspiracy.

Nor is there a grain of evidence that Leticia knew of, or was connected with, the six underlying drug possession counts forming the basis for six of her seven firearm charges. There is no evidence that she had any relationship, personal or professional, with Angulo–Lopez, Umansor–Alvarez or Omelas–Martinez. There is no evidence that she was aware of their activities, or that she participated in any act that was connected, directly or indirectly, to their drug possession offenses. It's clear she knew Zamora because she spoke with him on the telephone, but there is no evidence connecting her to his illegal conduct.

In the end, the only evidence that connects Leticia to the predicate offenses appears to be her marriage to Uriel. Although the marital relationship may have some relevance, *see, e.g., United States v. Gomez,* 810 F.2d 947, 960 (10th Cir.), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987) (marriage to conspirator relevant to proving guilt of conspiracy), finding her guilty based solely upon her marital relationship with Uriel is impermissible, *see, e.g., United States v. Ritz,* 548 F.2d 510, 522 (5th Cir.1977) ("guilt of a conspiracy cannot be proven solely by family relations or other type[s] of close association[s]."). This general rule against establishing guilt by association equally applies in the *Pinkerton* § 924(c) context.

In short, given Leticia's lack of participation in the conspiracy and her lack of involvement with the predicate offenses, the use of firearms by the other conspirators *in relation to* these offenses was not reasonably foreseeable to her. Accordingly, we vacate Leticia's § 924(c) convictions, except Count 53 which was predicated upon the conspiracy itself.

Our holding today is narrow. We do not address whether foreseeability continues to suffice for the predicate offense prong of § 924(c). Rather, we hold that we cannot conclude, without violating the fundamental precepts of due process, that Leticia could have foreseen the other conspirators' use of firearms in relation to the predicate offenses.

Although Meras, Barron and Uriel argue otherwise, we do not notice any due process error with respect to their convictions. As we discuss below, these three cannot establish any lack of foreseeability.

### D. *Sufficiency of the Evidence in Regard to Firearm Counts*

█ Barron, Meras and Uriel challenge the sufficiency of the evidence to support their firearm convictions. They make two arguments. First, they argue that since there was no evidence that they had actual knowledge of either their co-conspirators' use of a weapon or of the locations where the weapons were stored, as a matter of law, the evidence was insufficient to support their § 924(c) convictions. Appellants misunderstand the law. Even assuming that a defendant cannot be convicted of violating § 924(c) unless he is has some knowledge of the predicate offense, *Pinkerton* does not require actual knowledge as to the *weapons. United States v. Raborn,* 872 F.2d 589, 595–96 (5th Cir.1989); *United States v. Martinez,* 958 F.2d 217, 219 (8th Cir.1992); *United States v. Cummings,* 937 F.2d 941, 943–44 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 395, 116 L.Ed.2d 345 (1991). *Pinkerton* requires only that the use of the weapon in relation to the predicate drug offense be a reasonably foreseeable outcome of the conspiracy agreement.

█ Second, although they still speak in terms of the sufficiency of the evidence, Meras, Barron, and Uriel follow Leticia in arguing that an individual may not be convicted under *Pinkerton* of a violation of § 924(c) when his liability for both the predicate offense prong and the weapon prong of § 924(c) rests only upon foreseeability. Again, we need not decide whether *Pinkerton* requires more than foreseeability as to the predicate offense prong of § 924(c). Even if we accept that there must be some connection to, or actual knowledge of, the predicate offense before an individual can be said to have foreseen his co-conspirator's use of a weapon, in these instances sufficient evidence exists of such a connection or knowledge.

Meras and Barron were convicted of five counts of use of a firearm in relation to a drug trafficking offense; Uriel was convicted on the same five counts and an additional two counts. These three appellants were major players in the conspiracy that served as the predicate offense for count 53. They cannot argue successfully that they did not have a direct connection to that predicate offense. As to counts 52, 57 and 58 which were tied to the Angulo–Lopez possessions, Angulo–Lopez worked with Uriel and acted as an alternative supplier for Uriel's customers and distributors. Two of those distributors were Barron and Meras, both of whom had frequent contact with Angulo–Lopez. Hence, there was sufficient evidence to connect these three appellants to Angulo–Lopez's posses-

sion offenses. In regard to count 21 which was tied to Zamora's possession offense, he worked closely with Uriel at the higher echelons of the Castaneda organization. Moreover, evidence suggested that the drugs recovered from Zamora's residence were intended for Barron and Meras.

Uriel's additional two convictions pertained to count 72, tied to Ornelas–Martinez's possession offense, and count 68, tied to Umansor–Alvarez's possession offense. Both these men were street-level dealers supplied by Uriel. Ornelas–Martinez considered himself to be Uriel's and Angulo–Lopez's partner and he purchased large volumes of drugs from Uriel. It is specious to argue that Uriel was not connected to these men's drug possession offenses given that Uriel supplied the drugs they possessed or directed them to an alternative supplier. We affirm these three appellants' firearm convictions.

## II. Sentencing

At the beginning of the consolidated sentencing hearing, the district court ruled that, because the conspiracy count had specified that at least one kilogram of heroin and five kilograms of cocaine were involved in the offense, the sentencing court was not free to determine whether the drugs attributable to the appellants were less than the amount that would trigger the statutory minimum sentence of 120 months pursuant to 21 U.S.C. § 841(b)(1)(A). West supp.1991. The court then sentenced Umansor–Alvarez to ten years plus one month for his role in the conspiracy based on the guidelines and § 841(b)(1)(A). The court sentenced Ornelas–Martinez to the statutory minimum plus 68 additional months.

■ Ornelas–Martinez and Umansor–Alvarez argue that the district court's ruling was an error of law. We agree. We review the district court's factual determinations for clear error and its legal interpretations of the Guidelines de novo. United States v. Wilson, 900 F.2d 1350, 1355 (9th Cir.1990). Pursuant to U.S.S.G. § 3D1.2(d), all counts charging drug related offenses and offenses involving use of a communications system for drug business are grouped together. When a defendant has been convicted of conspiracy to distribute drugs, the court will attribute to a defendant the quantity of drugs which he should have reasonably foreseen would be involved in the operation, regardless of whether that amount was specified in the indictment. See U.S.G. § 1B1.3, commentary n. 1. Title 21 U.S.C. § 841(b)(1)(A) requires that the court impose a minimum sentence of ten years if a defendant's drug offense involves one kilogram or more of heroin or five kilograms or more of cocaine.

■ As we have previously clarified,

[Title 21 U.S.C. § 841(a) ] does not specify drug quantity as an element of the substantive offense of possession with intent to distribute; quantity is instead relevant to the penalty provisions of section 841(b), and is a matter for the district court at sentencing.

United States v. Sotelo–Rivera, 931 F.2d 1317, 1319 (9th Cir.1991), cert. denied, ––– U.S. ––––, 112 S.Ct. 1186, 117 L.Ed.2d 428 (1992). Thus, § 841(a) does not alter the court's responsibility to assess a defendant's "individual ... level of responsibility" for the amount of drugs involved in an offense by determining, in accord with the Guidelines, the amount that the defendant "could reasonably foresee ... would be involved" in the offense of which he was guilty. United States v. Becerra, 992 F.2d 960 (1993). Of course, if the court makes a finding that the statutory minimum quantity is attributable to a defendant, the court must impose the statutory minimum sentence notwithstanding that that sentence might be higher than the Guideline sentence. United States v. Sharp, 883 F.2d 829, 831 (9th Cir.1989).

■ The sentencing court's responsibility to determine the quantity of drugs attributable to a defendant is not altered by the fact that the amount involved in a drug conspiracy is specified in the indictment. Quantity is not an element of a conspiracy offense. United States v. Harrison–Philpot, 978 F.2d 1520, 1523 (9th Cir.1992), cert. denied, ––– U.S. ––––, 113 S.Ct. 2392, 124 L.Ed.2d 294 (1993). Moreover, as we have recently clarified, a conspiracy conviction under § 846 does not establish beyond a reasonable doubt that a defendant conspired

with every other person charged in the indictment. *United States v. Petty,* 992 F.2d 887, 890 (9th Cir.1993). Rather, a conspiracy conviction "simply means that he agreed with at least one other person to violate the drug laws." *Id.* (internal quotations omitted); *see United States v. Thompson,* 944 F.2d 1331, 1343–44 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole,

> [u]nder the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy *but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement* with the conspirators.

*Petty,* 992 F.2d at 890 (emphasis added). This point was made a little differently by the Eighth Circuit when it observed that a generic conspiracy instruction, such as is involved here, does not require a jury to link individual defendants to a specific quantity of drugs, whereas *sentencing* requires such a linkage. *United States v. Jones,* 965 F.2d 1507, 1516 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 346, 121 L.Ed.2d 261 (1992).

■ Given the above, it is not relevant for sentencing purposes whether or not an indictment specifies the amount alleged in the conspiracy. *United States v. Gilliam,* 987 F.2d 1009, 1011–1012 (4th Cir.1993); *United States v. Jacobo,* 934 F.2d 411, 416–417 (2d Cir.1991). This is true even in a case such as this where the conspiracy instruction mistakenly told the jury to consider quantity as an element of guilt. We observe that the jury was not required to render a special verdict and thus its finding of quantity pertained to the entire conspiracy rather than to any individual defendant. Accordingly, the sentencing court committed an error of law when it ruled that it was not free to determine whether the amount of drugs attributable to appellants fell below the amount that would trigger the statutory minimum.

■ Nevertheless, if this error is harmless we will not remand for resentencing. *Williams v. United States,* —— U.S.

——, ——, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992). The district court's error was harmless as to Ornelas–Martinez's sentence. The record indicates that Ornelas–Martinez not only had a connection with Uriel but also with Angulo–Lopez. The intercepted conversations between Ornelas–Martinez and Uriel concerned past deals involving kilogram quantities of cocaine and Ornelas–Martinez's current use of used kilogram wrappers to rewrap cut kilograms of cocaine and heroin. When he was arrested, Ornelas–Martinez volunteered that he was aware of a co-conspirators' possession of twenty kilograms. Moreover, the sentencing court awarded Ornelas–Martinez a base offense level of 36 rather than a level 32 which it thought it could not go below. Therefore, we affirm Ornelas–Martinez's sentence.

This error was not harmless, however, for Umansor–Alvarez. In the record before us, there is no evidence to indicate that Umansor–Alvarez conspired with any other person other than Uriel. The transactions between Uriel and Umansor–Alvarez involved small amounts. The pre-sentence report and the record attribute only 77.7 grams of cocaine and 45.4 grams of heroin to Umansor–Alvarez. Furthermore the record indicates that Umansor–Alvarez was solely a low-level dealer who worked alone out of a local tavern dealing in amounts less than an ounce. Indeed, there is evidence that Umansor–Alvarez asked Uriel to engage in sales of amounts less than an ounce, but Uriel refused to do so. Uriel clearly engaged in large transactions with his co-conspirators. However, the amount involved in these transactions is not relevant to the quantity to be attributed to Umansor–Alvarez unless there is some evidence linking him to those individuals. *Petty,* 992 F.2d at 890. In short, the record is bereft of any evidence that indicates Umansor–Alvarez considered himself to be involved in an agreement to deal with even a single kilogram amount of drugs.

We observe that the district court adjusted Umansor–Alvarez's base offense level. Initially, the district court awarded Umansor–Alvarez a base offense level of 32 without comment and notwithstanding the recommendation of the pre-sentence report that

Umansor–Alvarez be awarded an offense base level of 34. The court's silence on the issue of quantity and its decision to award a level 32 was in keeping with its decision that it could not make a finding that less than one kilogram of heroin or five kilograms of cocaine were attributable to Umansor–Alvarez. The government pointed out to the district court that it had failed to consider Umansor–Alvarez's criminal history category which raised his base offense level to 34. In order to keep the base offense level at 32, the sentencing court awarded Umansor–Alvarez a two-point downward adjustment for being a minor participant. The court observed when making this downward adjustment that while it had no doubt that "in terms of foreseeability ... he had a very good idea he was dealing with a big time dealer ... he himself emerges as essentially a street level dealer."

Taken alone, the fact that Umansor–Alvarez knew he was dealing with a big-time dealer is insufficient to establish foreseeability. *Jones*, 965 F.2d at 1507; *United States v. Edwards*, 945 F.2d 1387 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). "[I]f a defendant agrees to aid to aid a large volume dealer in completing a single, small sale of drugs, the defendant will not be liable for prior or subsequent acts of the dealer that were not reasonably foreseeable." U.S.S.G. § 1B1.3 illustration e. Rather, there must be a finding that Umansor–Alvarez had an agreement with these other co-conspirators, *Petty*, 992 F.2d at 890, or somehow "benefitted from his co-conspirator's activities," *Jones*, 965 F.2d at 1517, before the drugs connected to those co-conspirators can be attributed to him.

Insofar as the court's observations are findings of fact, we conclude that they pertain to the justification for the downward adjustment and not to the issue of the quantity of drugs attributable to Umansor–Alvarez. We draw this conclusion in light of the court's repeated ruling that it was not free to determine that the quantity fell below the amount that triggered the statutory minimum. We also conclude, however, that if we were to treat the sentencing court's statements as findings of fact as to the amount of drugs attributed to Umansor–Alvarez, we would find them insufficient. Therefore, we remand Umansor–Alvarez's sentence for specific findings as to the quantity of drugs foreseeable to him.

## CONCLUSION

In conclusion, we vacate all of Leticia's firearm convictions which were tied to her co-conspirators' drug possessions; we affirm her conviction based on the conspiracy itself. We affirm Ornelas–Martinez's sentence on the basis of harmless error. We remand Umansor–Alvarez's sentence for findings as to the quantity of drugs reasonably foreseeable to him for sentencing purposes.

AFFIRMED in part, VACATED and RE-MANDED in part.