67 F.3d 309
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Philip Charles KELLOTAT, Defendant-Appellant.
 No. 94-30249.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 12, 1995.
Decided Sept. 25, 1995.
 
 1
 Before: GOODWIN and HUG, Circuit Judges, and SCHWARZER, District Judge*
 
 
 2
 MEMORANDUM**
 
 
 3
 Following a jury trial at which he represented himself, Philip Charles Kellotat ("Kellotat") was convicted on five counts of possession, manufacture, and distribution of methamphetamine, possession of ephedrine with intent to manufacture methamphetamine, and conspiracy to possess, manufacture, and distribute methamphetamine. Through his appointed counsel, Kellotat appeals his conviction, arguing that the district court erred in denying his motion to dismiss on speedy trial grounds and denying his motion to suppress evidence. He also challenges the sentence imposed, claiming that the district court erred in calculating his criminal history and in calculating the drug quantities.
 
 
 4
 In a pro se brief, Kellotat raises a number of additional issues that he contends are meritorious grounds for appeal, but which his appellate counsel was unwilling to include in the appeal. In conjunction with the appeal, Kellotat claims he was denied effective assistance of counsel on appeal, and moves this court for appointment of substitute counsel to raise the issues his appointed counsel would not raise.
 
 1. Denial of Motion to Dismiss
 
 5
 Kellotat argues that the district court erred in denying his motion to dismiss for violations of the Speedy Trial Act. 18 U.S.C. Sec. 3161(b) (1988). We review factual findings concerning the Speedy Trial Act for clear error, and questions of law regarding its application de novo. United States v. Nash, 946 F.2d 679, 680 (9th Cir.1991).
 
 
 6
 The Speedy Trial Act requires, in relevant part, that: [a]ny ... indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested ... in connection with such charges.
 
 
 7
 18 U.S.C. Sec. 3161(b). Failure to comply with section 3161 requires dismissal of the indictment. 18 U.S.C. Sec. 3162(a)(1).
 
 
 8
 On April 14, 1993, Kellotat was arrested in Multnomah County, Oregon on an outstanding state warrant for violating conditions of a county pretrial drug diversion program. On April 28, 1993, Kellotat was indicted in state court on charges of manufacturing ephedrine hydrochloride. The prosecutor who pursued the state indictment, District Attorney John Hoover ("Hoover"), was both a prosecutor for Multnomah County as well as a Special Assistant United States Attorney. Although Hoover initially exercised his discretion to pursue the state indictment against Kellotat, he later presented the case to the United States Attorney's Office to be considered for federal prosecution. On May 21, 1993, Hoover received the authority he needed to prosecute Kellotat in federal court for manufacturing methamphetamine. On June 2, 1993, the state indictment was dismissed, and on June 23, 1993, Kellotat was indicted on the federal charges.
 
 
 9
 Kellotat then moved to dismiss the federal indictment on the ground that his April 14, 1993 arrest on state charges should be deemed to have triggered the running of the Speedy Trial Act's 30-day time limit for obtaining an indictment; Kellotat claimed that because he was not indicted on the federal charges until June 23, 1993, beyond the 30-day limit, the Act was violated and the indictment must be dismissed.
 
 
 10
 Kellotat has admitted, both in his motion below and now on appeal, that the general rule is that only a "federal" arrest triggers the running of the 30-day time period under the Speedy Trial Act, regardless of the degree of federal involvement in the state law enforcement activities. See United States v. Redmond, 803 F.2d 438, 440 (9th Cir.1986), cert. denied, 481 U.S. 1032 (1987). Nonetheless, Kellotat maintained before the district court, and argues now on appeal, that his state arrest should be deemed a "federal" arrest for purposes of the Speedy Trial Act because (1) the state prosecution was a "sham" and a mere "ruse for delay in obtaining a federal indictment," (Bl.Br. at 8-9), (2) the case against Kellotat in federal court was "essentially the same case," involving the same facts and prosecuted by the same person, as could have been brought in state court, and (3) the state authorities were "mere tools" of the federal prosecution. Despite Kellotat's assertions, the district court denied Kellotat's motion to dismiss, finding no grounds for deeming Kellotat's state arrest a federal arrest for purposes of the Speedy Trial Act. We agree.
 
 
 11
 As to Kellotat's first argument, we have recognized that the time periods under the Speedy Trial Act may be triggered by a state or civil detention that is merely a ruse for delay in obtaining a federal indictment. See, e.g., United States v. Hoslett, 998 F.2d 648, 653 (9th Cir.1993) (recognizing ruse exception but finding no evidence of ruse in given case); United States v. Cepeda-Luna, 989 F.2d 353, 357-58 (9th Cir.1993) (same). See also United States v. Okuda, 675 F.Supp. 1552, 1555 (D.Haw.1987) (finding violation of Speedy Trial Act where federal authorities purposefully used Immigration and Naturalization Service to detain defendant pending filing of federal criminal complaint). However, the state prosecution here was not merely a ruse for delay in obtaining a federal indictment, because, as Hoover testified, he was fully prepared to prosecute Kellotat on the state charges if the federal prosecution did not go forward. See United States v. Benitez, 34 F.3d 1489, 1495 (9th Cir.1994) (holding the ruse exception did not apply where state fully intended to proceed with prosecution if federal authorities did not file charges), cert. denied, 115 S.Ct. 1268 (1995).
 
 
 12
 To maintain his second Speedy Trial Act argument, Kellotat relies on United States v. Saunders, 728 F.Supp. 3 (D.D.C.1989), vacated per curiam, 1993 WL 31583 (D.C.Cir.1993). Because the appellate court vacated the order in Saunders, that opinion is not persuasive authority. See, e.g., Durning v. Citibank, 950 F.2d 1419, 1424 n. 2 (9th Cir.1991). Even if it were, we would find it distinguishable because the case against Kellotat in federal court was not "essentially the same case" as the state one.[1]
 
 
 13
 Kellotat's third and final argument regarding his speedy trial rights is that his state arrest should be deemed a federal one because the state authorities were "mere tools" of the federal prosecution, used to manipulate the state proceedings to allow the federal authorities to circumvent the speedy trial requirements. United States v. Liddy, 542 F.2d 76, 79-80 (D.C.Cir.1976) (recognizing exception but finding that facts did not support application of exception). This is merely a paraphrase of Kellotat's first argument, which we rejected on the ground that Hoover was fully prepared to prosecute Kellotat on the state court charges if the federal prosecution did not go forward. See Benitez, 34 F.3d at 1495.
 
 2. Denial of Motion to Suppress
 
 14
 Kellotat's second point is that the district court erred in denying his motion to suppress evidence seized from Kellotat's van. The district court's determination that the seizure of evidence is lawful is reviewed de novo, and its finding of facts is reviewed for clear error. United States v. Gonzales, 979 F.2d 711, 712 (9th Cir.1992).
 
 
 15
 On March 19, 1993, Portland police officers investigated a report that passengers in a van parked at a Chevron service station had an Uzi in their possession, and had made some threat with the gun. When the police arrived at the service station, the man occupying the driver's seat, Duval Cox Nelson ("Nelson"), said he was moving property from Milwaukie, Oregon, to Vancouver, Washington, for Kellotat. The officers asked if there was an Uzi in the van, and Nelson said there was not. He then told the police they were free to search the van. During the search, police found a locked toolbox and asked Nelson what was in it. Nelson said he did not know, but he popped it open with a screwdriver so they could look inside. The toolbox contained some quantity of a controlled substance or a listed chemical precursor that could be used to manufacture a controlled substance.
 
 
 16
 On September 16, 1993, Kellotat filed a motion to suppress the evidence seized from the van and toolbox on the ground that the search was performed without a search warrant. The district court initially granted the motion. Based on the police officers' testimony, the court found that Nelson could not reasonably have believed he was free to leave. Therefore, the court held that the "stop" was a "seizure" for Fourth Amendment purposes, requiring reasonable suspicion by the officers to justify the search.
 
 
 17
 On the government's motion for reconsideration, the district court reversed its decision based on testimony offered by Nelson himself. Nelson testified that, at all times during his interaction with the police, he believed he was free to leave. He testified that he gave the officers permission to search the van because he knew there was no Uzi in it and believed there were no drugs in it either. He also testified that he opened the toolbox voluntarily, and that he did not know what was in the box before he opened it. Based on this testimony, the court found that the encounter with the officers was not a "stop," and that even if considered a "stop," it never became a "seizure" for Fourth Amendment purposes.
 
 
 18
 Kellotat now argues that the district court erred in denying the motion to suppress because (1) the encounter between Nelson and the police officers was a seizure for purposes of the Fourth Amendment; (2) Nelson's conduct in opening the toolbox was state action and an unreasonable warrantless search, and (3) Nelson did not have authority to consent to the search of the toolbox, nor could the police reasonably have believed he did.
 
 
 19
 a. Initial encounter. Kellotat first contends that the officers' interactions with Nelson constituted a seizure because Nelson could not reasonably have believed he was free to leave. See, e.g., United States v. Johnson, 903 F.2d 1219, 1221 (9th Cir.) (essential inquiry in determining whether encounter constitutes seizure for fourth amendment purposes is whether person stopped reasonably believed he was free to leave), cert. denied, 498 U.S. 985 (1990). Kellotat bases this contention on the length of the encounter (30 minutes), the officers' testimony that they were in control of the situation, and Nelson's testimony that he opened the box "to clear things up and get out of there." We reject Kellotat's argument.
 
 
 20
 As the district court observed, Nelson specifically and repeatedly testified that he believed he was free to leave. The district court accepted this testimony and we see no error in its doing so. Moreover, the evidence suggests Nelson's belief was reasonable. As the defendant described in his own brief, the police approached the van " 'casually' 'without lights on or anything' " (Bl.Br. at 12); similarly, the police apparently did not draw their guns, block the path of the van, or make any other show of authority. Absent such evidence, we hold that it was reasonable for Nelson to believe he was free to leave and that the interaction between Nelson and the police was therefore a consensual encounter, not a seizure. See Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968) (stating in dicta that seizure has occurred only where officer restrained citizen's liberty by means of physical force or show of authority); United States v. Erwin, 803 F.2d 1505, 1508 (9th Cir.1986) (encounter consensual where stop occurred in public and officers displayed no force); Johnson, 903 F.2d at 1221 (no seizure where police did not touch person or block his path, where police told him he was free to leave, and where he stated he understood he was free to leave).
 
 
 21
 b. Search of toolbox. Kellotat's second and third arguments both challenge the search of the toolbox. We need not reach the merits of these arguments, because Kellotat lacks fourth amendment standing to challenge this search. Standing to challenge search and seizure is a matter of substantive fourth amendment law. United States v. Taketa, 923 F.2d 665, 669 (9th Cir.1991). To challenge a search under the fourth amendment, a "defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing an actual subjective expectation of privacy which society is prepared to recognize." United States v. Davis, 932 F.2d 752, 756 (9th Cir.1991). Here, Kellotat had no legitimate expectation of privacy related to the toolbox, because he testified at trial that he did not own it. See United States v. Gonzales, 979 F.2d 711, 714 (9th Cir.1992) (defendant lacked standing to challenge search of bags where he denied ownership of them); United States v. Sanford, 673 F.2d 1070, 1072 (9th Cir.1982) (testimony at trial may be used to sustain denial of motion to suppress evidence, even if such testimony was not given at suppression hearing).
 
 3. The Calculation of Criminal History
 
 22
 Kellotat's third point is that the district court erred in calculating his criminal history. As an interpretation of the sentencing guidelines, the district court's determination that Kellotat is a career offender is reviewed de novo. United States v. Becker, 919 F.2d 568, 570 (9th Cir.1990), cert. denied, 499 U.S. 911 (1991). The district court's factual findings relating to prior convictions are reviewed for clear error. United States v. Gross, 897 F.2d 414, 416 (9th Cir.1990).
 
 
 23
 Based on Kellotat's two previous robbery convictions and one previous burglary II conviction,[2] the presentence report recommended that Kellotat be sentenced as a career offender pursuant to United States Sentencing Guidelines ("USSG") Sec. 4B1.1. Section 4B1.1 provides that a defendant is a career offender if he committed a felony that was either a crime of violence or a controlled substance offense and had at least two prior felony convictions of either a crime of violence or a controlled substance offense. Kellotat does not challenge the court's use of his two prior robbery convictions at sentencing. Because those two prior convictions alone qualify Kellotat as a career offender, we need not consider his challenge of the use of the burglary conviction.
 
 4. The Calculation of Drug Quantities
 
 24
 Kellotat's fourth point is that the district court erred in adopting the drug quantities calculated in the presentence report. We review the district court's interpretation of, and therefore calculation under, the guidelines de novo, see United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, 504 U.S. 978 (1992), and find no error.
 
 
 25
 Pursuant to USSG Sec. 1B1.3 (Relevant Conduct), the presentence report held Kellotat accountable for an estimated total of 4.4 kilograms of methamphetamine. This amount was calculated by adding the estimated 1018 grams actually produced by the conspiracy to the estimated 3400 grams that could have been produced from the 5000 grams of ephedrine seized in the investigation. In Kellotat's sentencing memorandum, he objected on several grounds to the quantity calculated. The district court overruled his objections and adopted the findings of the presentence report.
 
 
 26
 Kellotat now challenges the quantity calculation on three grounds: (1) that the jury did not find him guilty beyond a reasonable doubt of specific acts involving certain quantities of the methamphetamine for which he was held accountable; (2) that the record does not establish reliable evidence upon which the court could have found, even by a preponderance of the evidence, that the quantities alleged in the presentence report were correct; and (3) that the court should not have based its sentence on the quantity of methamphetamine that could have been produced from the ephedrine seized.
 
 
 27
 a. No findings beyond a reasonable doubt. First, Kellotat challenges the inclusion of certain quantities of methamphetamine in the sentencing calculation because he was not found guilty beyond a reasonable doubt of specific acts involving those drug quantities. Based on this rationale, Kellotat contends that he should not have been held accountable at sentencing for either the quantity (453 grams) of methamphetamine produced in November/December 1992, or the quantity that could have been produced from the 4,290 grams of ephedrine found in the storage locker.
 
 
 28
 More specifically, Kellotat argues that the Count 1 conspiracy conviction could not be the basis for holding him accountable for these amounts, because a conspiracy conviction does not necessarily establish that the defendant conspired with all members, nor does it prove the defendant culpable for the entire quantity of drugs attributable to the conspiracy. See, e.g., United States v. Castaneda, 9 F.3d 761, 769-770 (9th Cir.1993), cert. denied, 114 S.Ct. 1564 (1994). Similarly, Kellotat argues that the Count 5 conviction could not be the basis for holding him accountable for the ephedrine found in the storage locker, because Count 5 only included ephedrine he possessed between March 1 and March 19, 1993, and the ephedrine in the storage locker was not found until March 23, 1993.
 
 
 29
 Kellotat's argument fails, however, because a jury need not have found Kellotat guilty beyond a reasonable doubt of acts associated with the quantities in question in order for the court to have properly held Kellotat accountable for those quantities at sentencing. First, in determining relevant sentencing facts, the court applies a preponderance of the evidence standard, not a reasonable doubt standard. See United States v. Navarro, 979 F.2d 786, 788 (9th Cir.1992). Second, the acts for which a court can hold a defendant accountable at sentencing are not limited to those of which he was found guilty at trial.
 
 
 30
 USSG Sec. 1B1.3 prescribes the relevant conduct for which a defendant is held accountable at sentencing. Pointing out the distinction between accountability for sentencing purposes and guilt for purposes of conviction, Application Note 1 to Sec. 1B1.3 states as follows:
 
 
 31
 The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.
 
 
 32
 Pursuant to USSG Sec. 1B1.3(a)(1) and (2), the sentencing court must hold the defendant accountable both for acts he personally committed as well as for "all reasonably foreseeable acts and omissions" committed by others in furtherance of the conspiracy. More specifically, in sentencing for drug offenses, the court must hold the defendant accountable for "all quantities ... with which he was directly involved," as well as for "reasonably foreseeable quantities ... within the scope of the criminal activity he jointly undertook." USSG Sec. 1B1.3, comment. (n. 2). See also Castaneda, 9 F.3d at 770. As a result, in determining an offense level at sentencing, a court must sometimes consider "[t]ypes and quantities of drugs not specified in the count of conviction...." USSG Sec. 2D1.1, comment. (n. 12) (referencing Sec. 1B1.3(a)(2)).
 
 
 33
 Thus, Kellotat's argument fails because the relevant inquiry is not whether the jury found Kellotat guilty beyond a reasonable doubt of specific acts involving all the quantities for which he was held accountable at sentencing. Instead, the relevant inquiry is whether the sentencing court found, by a preponderance of the evidence, that the quantities on which the sentence was based were quantities "with which [Kellotat] was directly involved" or "reasonably foreseeable quantities ... within the scope of the criminal activity he jointly undertook." USSG Sec. 1B1.3, comment. (n. 2); Navarro, 979 F.2d at 788 (sentencing court applies preponderance of the evidence standard in determining relevant sentencing facts). In making such a finding, a court may adopt the factual findings of the presentence report as long as they are properly supported by the facts and guidelines. Navarro, 979 F.2d at 789. Here, the district court considered the physical evidence and the testimony of the witnesses at trial and found, by a preponderance of the evidence, that Kellotat was responsible for the amount of methamphetamine calculated in the presentence report.
 
 
 34
 b. Insufficient evidence to meet preponderance of evidence standard. Kellotat next argues that the record does not establish reliable evidence that could support, even by a preponderance of the evidence, a finding that the quantities calculated in the presentence report were correct. In adopting the quantities set out in the presentence report, the court considered the testimony of various witnesses, as well as physical evidence that supported the testimony. Kellotat now primarily challenges the credibility of the testimony. The district court was in the best position to weigh the credibility of the testimony. It did so and found the testimony, together with other evidence, sufficient to support a finding by a preponderance of the evidence that Kellotat should be held accountable for the quantities of methamphetamine in the presentence report. We see no reason to disturb the district court's finding.
 
 
 35
 c. Quantity of methamphetamine that could have been produced from ephedrine seized. Kellotat finally argues that 21 U.S.C. Sec. 841 does not allow a sentencing court to impose a minimum or raise a maximum sentence based on quantities of methamphetamine that could have been produced from ephedrine seized. Kellotat bases this assertion on the fact that the statute does not mention "precursors" in the text. However, we have held the opposite and, in cases involving conspiracies, have affirmed sentences that were based on quantities of drugs calculated by converting the amount of precursor seized into the amount of drug that could have been made from that precursor. See, e.g., United States v. Myers, 993 F.2d 713, 716 (9th Cir.1993); United States v. Aichele, 941 F.2d 761, 766 (9th Cir.1991).
 
 
 36
 Kellotat attempts to distinguish Myers on the ground that the defendant in that case was convicted solely of conspiracy to manufacture methamphetamine. Myers, 993 F.2d at 714. By contrast, Kellotat was convicted of possession of ephedrine (Count 5) separately from and in addition to conspiracy to possess, manufacture and distribute methamphetamine (Count 1). Kellotat argues that he should have received separate sentences for Count 5 and Count 1; therefore, he should only have been held accountable for the ephedrine itself, in connection with Count 5, instead of the methamphetamine that could have been made from it, in connection with Count 1.
 
 
 37
 This argument fails. Kellotat's Count 5 conviction was for possession of ephedrine with intent to manufacture methamphetamine, and Count 5 was pled as overt act 14 in the conspiracy count. Accordingly, under USSG Sec. 3D1.2(d), the sentencing court was required to group together all the counts on which Kellotat was convicted. Under USSG Sec. 3D1.3(b) and corresponding Application Note 3, the court was then required to apply the offense guideline that produced the highest offense level, which, in this case, was Sec. 2D1.1 for the offense of conspiracy. Therefore, Myers applies and the sentencing court correctly converted the quantity of ephedrine to the quantity of methamphetamine that could have been made pursuant to the conspiracy to manufacture. See Myers, 993 F.2d at 716.
 
 
 38
 5. Kellotat's Motion for Appointment of Substitute Counsel
 
 
 39
 Kellotat filed an additional brief pro se, stating that he objected to the brief filed by his counsel in that it did not include certain issues he wanted included in the appeal. In conjunction with this appeal, he also moves this court for appointment of substitute counsel to raise those additional issues he claims should have been raised by his appointed counsel.
 
 
 40
 In reviewing the issues raised in the pro se brief, we find that each is without merit, either because (1) it was subsumed in the points raised in the brief Kellotat submitted through his counsel, (2) it is not supported by the record, (3) we lack jurisdiction to consider it, or (4) it is unintelligible.
 
 
 41
 First, Kellotat raises several issues that were also raised under one or another of the four points considered above. He argues that once Hoover, the prosecutor, had sought indictment in one court, he was not "free to keep shopping around for a place to prosecute, and ... [was] bound by whatever speedy trial right he [gave] a defendant at arraignment" (Appellant's Pro Se Brief filed 1/23/95 at 2) (first issue). This claim mischaracterizes the nature of the charges. In essence, it restates Kellotat's challenge to the district court's denial of the motion to dismiss. As explained above, Kellotat was arrested on a state warrant for violations of a state-ordered drug diversion program. Once he was arrested, he was also charged under state laws prohibiting the manufacture of illegal drugs. The federal indictment was separate and distinct, and Kellotat's federal speedy trial rights did not arise until the date of the federal indictment.
 
 
 42
 Kellotat also raises the speedy trial issue again, (issue two), as well as the issue of seizure in the motion to suppress (issue six). He claims that, in violation of 18 U.S.C. 3161(d)(2), more than 70 days passed between his indictment and his trial. The district court properly disposed of this claim in its December 27, 1993, order, in which the court set forth the appropriate calculations demonstrating that there had been no speedy trial violation. We affirm the district court's decision. With regard to the seizure issue, the district court found, and we affirm for reasons discussed above, that Nelson's interaction with the police did not amount to a seizure for Fourth Amendment purposes.
 
 
 43
 Second, Kellotat raises several challenges that are unsupported by the record. Kellotat challenges the district court's denial of his motion to proceed as co-counsel (third issue), its denial of his motion for the appointment of an investigator to assist in his defense (fourth issue), and its denial of his motion for a second continuance in order to prepare for trial (fifth issue). Kellotat also appears to challenge the instructions given to the jury (seventh and eighth issues). Finally, Kellotat complains that the government failed to meet its burden of proof with regard to the possession of ephedrine and conspiracy charges (ninth and tenth issues), and with regard to the form of methamphetamine involved (thirteenth issue). However, Kellotat fails to provide citations to or excerpts from the record in support of his arguments on any of these issues. Moreover, his arguments fail to raise a meritorious issue.
 
 
 44
 Third, Kellotat raises an issue we lack jurisdiction to consider. Kellotat challenges the district court's use of the prior Oregon conviction in its career offender determination (twelfth issue), claiming that the Oregon conviction was "invalid." The state appellate court has jurisdiction to hear Kellotat's challenge of his state court conviction; we do not.
 
 
 45
 Fourth, Kellotat makes two additional arguments that are largely unintelligible and therefore impossible to address. One involves a challenge to the court's application of the sentencing guidelines and its calculation of the sentence (eleventh issue), and the other involves some evidence (a tape recording) that Kellotat claims the government "suppressed."
 
 
 46
 Regarding the motion for substitute counsel, we find that Kellotat has failed to justify the need for additional counsel. Kellotat expresses no dissatisfaction with the representation his appointed counsel provided on the issues she raised; rather, Kellotat seeks additional appointed counsel to raise additional claims. Because none of the additional issues Kellotat identified are meritorious, we see no need for additional counsel.
 
 
 47
 AFFIRMED.
 
 
 
 *
 The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Kellotat's April 14, 1993, arrest was for violating conditions of a state-ordered drug diversion program, and the later state indictment was on charges of manufacturing ephedrine hydrochloride. In contrast, the federal indictment was on charges of possession, manufacture, and distribution of methamphetamine. Thus, the state and federal charges here are not equivalent
 
 
 [2]
 Under California law, first-degree burglary involves entry of an inhabited dwelling or other building at night, with intent to commit larceny or any felony; the same crime committed during the day, however, constitutes second-degree burglary. Cal.Penal Code Secs. 459, 460 (West 1988 & Supp.1993)