**UNITED STATES of America, Plaintiff,**

v.

**Alberto M. CAPATI (1), Oscar R. Redondo (2), Defendants.**

**Criminal No. 94–1238–R.**

United States District Court,
S.D. California.

Sept. 29, 1997.

Alan D. Bersin, U.S. Atty., Randy K. Jones, Asst. U.S. Atty., San Diego, CA, for U.S.

Robert E. Boyce, Laura Schaefer, San Diego. CA, for defendant Capati.

Jonathan P. Milberg, Sherman M. Ellison, Los Angeles, CA, for defendant Redondo.

## ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL; AND GRANTING DEFENDANTS' MOTIONS FOR A NEW TRIAL

RHOADES, District Judge.

### I. Overview

Defendants Alberto Capati and Oscar Redondo move the Court for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Alternatively, they seek a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons set forth below, the Court denies the motions for a judgment of acquittal, and grants the motions for a new trial.

### II. Background

On September 27, 1996, a jury convicted Alberto Capati of conspiracy to interfere with commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951 (Count One); three counts of interference with commerce by robbery, in violation of the Hobbs Act (Counts Two, Four and Five); and two counts of using or carrying a firearm during or in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Three and Six). The jury convicted Oscar Redondo on Counts One, Four, Five and Six only. The convictions were a result of Defendants' involvement in a series of jewelry store robberies. The evidence at trial was as follows:

#### A. The Initial Arrangement

In 1989, Jeffrey Diaz, the Government's key witness, first met defendant Capati when Diaz enlisted in the army. Capati spent the latter part of his lengthy career in the army as a recruiter. In September of 1991, Diaz attempted to reenlist in the army. In late November or early December of 1991, during a meeting between Diaz and Capati at the army recruiting station in National City, the conversation turned to the subject of jewelry.

According to Capati's testimony, Diaz first approached the subject of jewelry by asking Capati whether he might like to purchase some items from Diaz's uncle who was closing a jewelry business in Los Angeles. Diaz showed Capati a brochure depicting the items that were available from Diaz's uncle. Eventually, Capati agreed to buy certain pieces of jewelry from the brochure and gave Diaz $2,000. (Tr. at 1575–78.)

Diaz painted a very different picture of the meetings. According to Diaz, he came to the recruiting station wearing a gold necklace and ring. Capati noticed the jewelry and asked Diaz whether similar items could be obtained. It was discussed that the jewelry would have to be "taken" and eventually agreed upon that the method for doing so would be a "snatch-and-grab".[1] (Tr. at 116–21.) Capati provided Diaz with a list of the items of jewelry desired and the two of them agreed on a price of $3,500 for Diaz to obtain the items through a series of grab-and-runs. (Tr. at 120–22).

#### B. The Grab–And–Runs

From the end of 1991 through January 1992, Diaz testified that he and the men he had assembled committed a series of grab-and-run thefts in order to obtain the jewelry for which Capati had paid. (Tr. at 160–80.) The first grab-and-run took place a few days after Christmas 1991. (Tr. at 165.) Diaz hired Allen Denson and Ernie Castro to commit the theft. With the assistance of Diaz, Denson and Castro stole two diamond rings from Diamond Designs in La Mesa, California. The following day, Diaz delivered the two rings to Capati and Redondo at the house of one of Redondo's relatives. (Tr. at 169–70). At this meeting, Redondo first became involved in negotiations with Diaz. The negotiations centered on Diaz obtaining the same type of jewelry for Redondo that Diaz was obtaining for Capati. (Tr. at 171.) Diaz ultimately gave one of the rings from the theft to Capati and one to Redondo. The ring given to Capati was applied against the advance payment that Capati had given to Diaz.

---

1. According to Diaz's testimony, a "snatch-and-grab" (also called a "snatch-and-run" or "grab-and-run") is perpetrated by asking a salesperson to see an item of jewelry and, when the salesperson removes the item from a secured case, the thief grabs the item and runs from the store.

A second grab-and-run took place in early January 1992 at a Zale's in Chula Vista. Although Diaz participated in the planning, the theft was committed by Denson and an individual named Marcus. Diaz could not recall what was done with the one diamond ring taken during the theft.

The third grab-and-run was committed by Denson in mid-January to late January 1992 at Don Roberto Jewelry in Plaza Bonita. (Tr. at 176–79). Diaz testified that immediately after the grab-and-run, he delivered the diamond tennis bracelet taken during the theft to Capati and Redondo at the recruiting station in National City. (Tr. at 177–78.) At this meeting, Redondo again expressed his interest in obtaining similar jewelry and also expressed an interest in obtaining Rolex watches.

The last of the grab-and-runs, which also took place in January 1992, was committed by Denson and another individual at a Jessop's jewelry store. Diaz testified that he sold the one Diamond ring taken in the theft to Sergeant Ramos, another army recruiter.

## C. The Switch From Thefts To Robberies

Although the grab-and-runs and the negotiations between Diaz and Defendants described thus far were certainly relevant to the proceedings, it is undisputed that the grab-and-runs did not constitute Hobbs Act robberies. The grab-and-runs were not alleged in the superseding indictment and the jury was instructed that the grab-and-runs did not constitute robberies under the law. Diaz testified, however, that after the last of the grab-and-runs an agreement was made with Defendants that Diaz would begin committing actual robberies, rather than grab-and-runs. This meeting was a crucial, and much disputed, turning point in the operation.

Diaz testified that after the last of the grab-and-runs he met with Capati and Redondo at the recruiting station in National City. (Tr. at 129, 184.) On direct examination, Diaz testified that the meeting took place in January 1992, or, more specifically, in mid-January 1992 around the same time as the Jessop's grab-and-run. (Tr. at 126, 181.)

On cross-examination, Diaz testified that the Jessop's grab-and-run took place on January 16, 1992, and that the meeting took place a short time thereafter. (Tr. at 325, 333–34.) When pressed, Diaz testified that the meeting took place within two or three days after the January 16 Jessop's grab-and-run and that the meeting was no later than January 19, 1992. (Tr. at 334–35.)

Diaz testified that the primary topic of the meeting was Defendants' concern regarding the pace at which Diaz was obtaining jewelry. (Tr. at 126–27, 182–83.) The result of the meeting, according to Diaz, was an agreement that harsher methods, including the use of force and the hiring of a gang, would be employed, thus transforming the grab-and-runs into "full-blown" robberies. (Tr. at 127–31, 183–85.) On the first day of his testimony, Diaz testified that the use of a weapon was not specifically discussed during the meeting. (Tr. at 130.) On his second day of testimony, however, Diaz testified that the use of a gun was indeed discussed. (Tr. at 183.) In any event, Diaz testified that there was no misunderstanding of the methods that were to be used and that Defendants, while not wishing to know the details of the robberies, told Diaz in effect to "do what you have to do." (Tr. at 130–31, 183–85.)

Capati testified that the pivotal meeting with Diaz never occurred. In fact, Capati testified that the meeting could not have occurred because he and his family were visiting the Grand Canyon at all times during the period in which Diaz testified that the meeting could have occurred. Capati testified that he left San Diego for the Grand Canyon on January 17, 1992. (Tr. at 1583–84.) He remained at the Grand Canyon until at least the 19th or 20th when the family headed to Lake Havasu before returning to San Diego. (Tr. at 1584–85.)

Capati produced highly persuasive proof of his trip to the Grand Canyon and Lake Havasu. Capati testified that he experienced car trouble during the Grand Canyon trip and that, as a result, he had his tires replaced at a gas station. Capati produced a receipt evidencing this. (Def's Ex. JJ.) The

trip to Arizona was further corroborated by family photographs and other receipts, as well as military leave records and the testimony of two of Capati's children. (Def's Ex. PP–1 through PP–6; RR–1 through RR–4.)

### D. The Robberies

The first of the armed robberies occurred at Diamond Designs in Mission Valley during the first week of February 1992. (Tr. at 188.) Prior to the robbery, Diaz had acquired a gun and instructed Denson what to do with it. (Tr. at 187.) Denson committed the robbery with another individual and took approximately 40 diamond rings. According to Diaz, Capati and Redondo took almost all of the rings stolen during the robbery.

In mid-February 1992, a robbery was committed at Diamond Designs in La Mesa. (Tr. at 193.) Diaz cased the jewelry store and hired Joe Perez to commit the robbery. Jason Diaz drove the getaway car. According to Diaz, both Capati and Redondo purchased some of the jewelry stolen in the robbery for 10% of the ticketed price.

The third robbery occurred during the first week of March 1992 at Weisfield Jewelers in Fashion Valley. (Tr. at 204.) Again, Diaz cased the store and then told Denson and Perez "to hit the place." (Tr. at 205.) Diaz testified that Capati and Redondo took some of the approximately 40 to 50 rings stolen during the robbery.

The next robbery occurred in late March 1992 at a Ben Bridge jewelry store in Mission Valley. (Tr. at 210.) After casing the store, Diaz arranged for Perez to come to San Diego to commit the robbery. Perez committed the robbery with Miguel Ortiz who was hired by Diaz as the operation grew. According to Diaz, Capati paid $10,000 and Redondo paid $4,000 for some of the loose diamonds, diamond rings and Rolex watches taken in the robbery.

During the second week of April 1992, the Sundance jewelry store in La Mesa was robbed. (Tr. at 232.) During the robbery, which was committed by Perez and Ortiz with Jason Diaz driving the getaway car, approximately seven diamond rings were taken.

Also in April 1992, the Weisfield store in Chula Vista was robbed. (Tr. at 243.) Diaz cased the store and acted as a lookout during the robbery. The robbery was committed by Perez, Ortiz and Ismael Meraz. Diaz testified that Capati purchased some of the diamond rings and a gold necklace that had been taken during the robbery and that Redondo also purchased some of the rings.

The final robberies occurred on April 30, 1992 at the Ben Bridge jewelers and Murata Pearl store in Mission Valley. (Tr. at 253.) Along with Perez, Diaz planned the robberies to be simultaneous. Rolex watches and diamond rings were taken during the robberies. The watches, according to Diaz, were delivered to Capati and Redondo. Diaz and Perez were arrested that evening.

### E. Other Participants' Testimony

Joe Perez testified regarding the details of the robberies. Perez also testified that he and Diaz had delivered the stolen jewelry to Capati and Redondo after some of the robberies. Perez admitted, however, that he never witnessed any conversations regarding the robberies involving Capati and that during the only conversation he heard involving Redondo, Redondo merely asked generally what Perez was doing what sort of things Perez was going to obtain. (Tr. at 594, 596.)

Miguel Ortiz similarly testified regarding the details of his participation in the robberies. His testimony, however, sheds no light at all on either Capati's or Redondo's involvement. Indeed, neither Defendant's name was even mentioned during Ortiz's testimony. Ortiz testified that he delivered the stolen jewelry to Diaz, was paid by Diaz, and never saw the jewelry after it was given to Diaz. (Tr. at 700.)

Ismael Meraz, much like Ortiz, testified to some details of the robberies, but provided no information concerning Defendants' involvement. It is unclear from Meraz's testimony whether he even knew who Defendants were, let alone their involvement if any.

Ernest Castro testified to his involvement in the robberies and stated that he had gone with Diaz to the army recruiting station on a few occasions. Castro was not involved in

Diaz's conversations at the recruiting station and could not identify the persons with whom Diaz spoke. (Tr. at 788.) Diaz testified only that he heard Capati's name mentioned while he was at the recruiting station and that he had once received a call from Capati while driving Diaz's car. Castro had no awareness of Capati's involvement in the purchasing of jewelry from Diaz, although he did hear Capati ask Diaz whether Diaz was going to commit a robbery. (Tr. at 795, 801.) Castro testified that when he and Diaz went to the recruiting station, they borrowed a car that, according to Diaz, belonged to Capati. Castro, however, later identified the vehicle as one belonging not to Capati but to a Sergeant Campos. (Tr. at 807, 1592–93.)

Allen Denson's testimony did not fit well with the Government's theory that Capati and Redondo were the "masterminds", or at least instigators, of the thefts and robberies. Denson testified that Diaz brought up the idea of committing robberies in May 1991, long before the alleged year-end meeting between Diaz and Capati. (Tr. at 835.) According to Denson, it was Diaz who planned the robberies, provided the weapon, took the jewelry, and promised to pay Denson. (Tr. at 862.) Contrary to Diaz's testimony that he had agreed with Capati to commit grab-and-runs, Denson testified that it was Diaz's plan to commit armed robberies from the beginning, but that Denson refused. (Tr. at 840.) Denson testified that he visited the recruiting station on many occasions and that Diaz met with Capati, but Denson had no knowledge of the conversations. Although Denson testified that he once received a call from Capati while Denson was driving Diaz's car, and that Capati wished to relay a message to Diaz that he would have some money, Denson admitted that he did not know what Diaz was doing with the jewelry. (Tr. at 862, 865–66, 870.) Throughout the duration of the robberies, Denson never recalled hearing Redondo's name. (Tr. at 863.)

Jason Diaz, in addition to relating his role as a driver in some of the robberies, testified that Jeffrey Diaz met with Capati, Redondo, and several other army recruiters. He testified that at these meetings, and at a dinner at the Capati house, the subject of jewelry was discussed. As his testimony was developed, it became clear that Jason had little or no direct involvement in any of the conversations and that much of his testimony was hearsay based upon what Jeffrey Diaz had allegedly told him. Eventually, the Court sustained an objection and motion to strike any of Jason's testimony that had been related by Jeffrey Diaz and as to Jason's testimony regarding the alleged meetings at the recruiting station. (Tr. at 1025, 1265–66.)

### F. Miscellaneous Evidence

F.B.I. agent Gerald Brown testified that during a consent search of the Capati residence he seized one tennis bracelet, eleven rings and a tag to one Rolex watch. Robert Silverman, who was employed by Diamond Designs, testified that one of the rings recovered in the search of the Capati residence was from the robbery of a Diamond Designs store. Robert Ferrell, who is employed by the parent company of Weisfield Jewelers, testified that three of the rings from the search of the Capati residence came from the Weisfield robberies. Doug Newton, who is employed by Ben Bridge Jewelers, identified five rings and two Rolex watches as being those taken during the Ben Bridge robberies. F.B.I. agent Michael Wieners testified that the fingerprints on one of the Rolex watches were those of Redondo.

Angel Reyes, the Government's cooperating witness, testified regarding his discussions with Capati and Redondo in the latter part of 1992, after Diaz had been arrested and the robberies had ceased. Reyes testified that he purchased the two Rolex watches described above from Redondo, that Reyes was told that Capati might have some loose diamonds for sale and that, if Reyes had known Capati and Redondo earlier, there would have been more jewelry available.

### III. Discussion

The Court will discuss first, Defendants' motions for a judgment of acquittal, and second, Defendants' motions for a new trial.

### A. Defendants' Motions For A Judgment Of Acquittal

Defendants present three grounds in support of their motions. First, Defendants ar-

gue that the Government failed to establish that the robberies had a substantial effect on interstate commerce and, therefore, that the Hobbs Act convictions are invalid. Second, Defendants contend that holding them vicariously liable for the use and carrying of a firearm under § 924(c) violates their due process rights. Third, Defendants argue that the Government's evidence was insufficient to establish a conspiracy to commit robbery.

### 1. The Hobbs Act's Jurisdictional Requirement

■ Relying on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Defendants argue that the Government was required to prove beyond a reasonable doubt that the robberies "substantially affected" interstate commerce and that proof of a *de minimis* effect cannot support a Hobbs Act conviction. While the Court previously has expressed some doubt about the Ninth Circuit's resolution of this issue,[2] it has now become clear that Defendants' argument is foreclosed by the Ninth Circuit's decisions in *United States v. Woodruff,* 122 F.3d 1185 (9th Cir.1997), and *United States v. Atcheson,* 94 F.3d 1237 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997).

### 2. Vicarious Liability Under § 924(c)

■ It is undisputed that neither Defendant physically used or carried a firearm during the robberies. The jury was instructed, however, that Defendants could be found guilty of the § 924(c) charges based upon a co-conspirator's use and carrying of a firearm under *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946). Relying on *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), Defendants contend that *Pinkerton* is inapplicable in the § 924(c) context because the statute applies only where the defendant, rather than a co-conspirator, used or carried the firearm. Defendants' contention is foreclosed by the Ninth Circuit's decision in *United States v. Fonseca–Caro,* 114 F.3d 906 (9th Cir.1997).

Nevertheless, Defendants argue that their relationship to the robberies and the use and carrying of a firearm was so "attenuated" that application of *Pinkerton* to the facts of this case results in a due process violation. Defendants' sole authority for this contention is *United States v. Castaneda,* 9 F.3d 761 (9th Cir.1993).

In *Castaneda,* the Ninth Circuit reversed six of seven firearm convictions of one of the defendants. In so doing, the court held that "due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight." *Id.* at 766. The holding of *Castaneda* was narrow. The court recognized that "[n]o circuit has yet found the relationship between a defendant and another conspirator's use of a firearm so remote that due process required reversing a § 924(c) conviction." *Id.* Despite this absence of precedent, however, the court could not overlook the fact that out of 360 phone calls involving the defendant, only one evidenced any knowledge of the conspiracy. Moreover, after summarizing all of the government's evidence, the court acknowledged that "the only evidence that connects [the defendant] to the predicate offenses appears to be her marriage to [a codefendant]." *Id.* at 768.

Here, viewing the evidence in the light most favorable to the Government, as the Court must when faced with a Rule 29 motion, the Government presented evidence of Defendants' involvement in the robberies sufficient to allay any due process concerns. Through the testimony of Jeffrey Diaz, the Government presented evidence that Defendants participated in an agreement whereby Diaz would steal specific items of jewelry for Defendants' benefit and would be paid by Defendants based upon the amount of jewelry stolen. Initially, the agreement was to commit only grab-and-run thefts. (Tr. at 121, 125–26.) Eventually, however, Diaz and Defendants agreed that robberies would have to be committed in order to speed up the pace of the operation. (Tr. at 127–31, 183–5.) Whether or not Defendants explicitly agreed that a firearm would be used during the

**2.** *See* Order Granting Alberto M. Capati's And Oscar R. Redondo's Motions For Release On Bond Pending Appeal, filed Oct. 18, 1996, at 9–19.

robberies, Diaz's testimony establishes that it was certainly *foreseeable* that a gun would be used. From this evidence, the jury could reasonably conclude that Defendants conspired to rob the jewelry stores and that it was foreseeable to them that firearms would be used. Unlike the facts of *Castaneda*, application of *Pinkerton* to the § 924(c) charges resulted in no due process violation here.

### 3. Sufficiency Of The Evidence

■ Defendants argue that the Government's evidence was insufficient to establish either an agreement to commit the robberies or that Defendants aided and abetted the robberies.

Where a Rule 29 motion attacks the sufficiency of the evidence, it is "well settled that the test for determining whether to grant such a motion 'is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in light favorable to the Government.'" *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir.1977) (quoting *United States v. Figueroa–Paz*, 468 F.2d 1055, 1058 (9th Cir.1972) )(alteration added by *Rojas* ). It is also "well settled that a district court does not have unlimited discretion in resolving a Rule 29(c) motion for judgment of acquittal." *United States v. Dreitzler*, 577 F.2d 539, 545 (9th Cir.1978), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1246, 59 L.Ed.2d 473 (1979). Rather, "a district court must bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" *Rojas*, 554 F.2d at 943 (quoting *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.1969)). "The uncorroborated testimony of an accomplice, although suspect, can support a conviction. This is 'the rule even though the accomplice is in a position to gain favors from the government by his testimony ... and even though there are inconsistencies in his story ... so long as it is not incredible or unsubstantial on its face.'" *United States v. Shelton*, 588 F.2d 1242, 1245 (9th Cir.1978) (quoting *Lyda v. United States*, 321 F.2d 788, 794–95 (9th Cir.1963)

(internal quotation marks omitted)), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979).

As set forth above, the Government presented sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Defendants agreed to commit the jewelry store robberies. Also, the jury reasonably could have concluded that Defendants induced through monetary payments the commission of the robberies and, therefore, that Defendants were guilty of aiding and abetting the robberies. In sum, the evidence was sufficient to support the conspiracy conviction and the convictions on substantive Hobbs Act counts on either a *Pinkerton* or aiding and abetting theory.

### 4. Conclusion

For the reasons set forth above, Defendants' motions for judgment of acquittal are denied. The Court now turns to Defendants' motion for a new trial.

## B. Defendants' Motion For A New Trial

Defendants present five grounds in support of their motion for a new trial: (1) the Court failed to instruct the jury on the mens rea element of robbery under the Hobbs Act; (2) the Court erroneously admitted hearsay statements under the co-conspirator exception to the hearsay rule; (3) the court erroneously failed to give the jury unanimity and multiplicity instructions; (4) the prosecutor impermissibly commented upon defendant Redondo's invocation of his Fifth Amendment right not to testify; and (5) the weight of the evidence was against the jury verdict.

### 1. Mens Rea Element Of Robbery Under The Hobbs Act

■ Defendants argue that the Court failed to instruct the jury on the mens rea required for robbery under the Hobbs Act. Specifically, Defendants argue that a Hobbs Act robbery requires the specific intent to deprive another of his or her property permanently. Defendants argue that the Court's failure properly to instruct the jury on the underlying robbery offense invalidates

their convictions for conspiracy and aiding and abetting.[3]

In order to decide whether to grant a new trial on this basis, the Court must engage in a three-point inquiry. First, it must determine whether a Hobbs Act robbery requires specific intent. Second, assuming the Court answers the first question in the affirmative, the Court must determine the proper standard of review to apply to its failure to instruct on this element. This requires determining whether Defendants objected to the error. Third, once the Court ascertains the proper standard of review, it must apply that standard to determine whether the error was harmless.

As discussed below, the Court concludes that the specific intent to deprive another of his or her property permanently is an element of robbery under the Hobbs Act. The Court also determines that Defendants objected to the Court's failure to instruct on this element, which means that harmless-error analysis applies. Applying this stan-

3. The parties jointly submitted the instruction that the Court gave on robbery. This fact, however, does not preclude Defendants from raising the issue under the doctrine of invited error, because the extent of Defendants' role in formulating the instruction is unclear. *United States v. Ward*, 914 F.2d 1340, 1344 n. 4 (9th Cir.1990) (holding that the doctrine of invited error did not preclude a party from raising the issue of a faulty jury instruction, even though the parties jointly submitted it, because the record did not reveal the extent of the party's role in formulating the instruction). Here, the record suggests that Defendants had little to do with formulating the instruction; it appears that the instruction was taken from a similar case before a different judge of this judicial district. (Tr. at 1895.)

4. The Hobbs Act defines robbery as follows:
 The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
 18 U.S.C. § 1951(b).

5. In House debate on the bill, Representative Hobbs, its sponsor, stated that "[t]he definitions in this bill are copied from the New York Code substantially." 91 Cong. Rec. 11,900 (1945).

dard, the Court concludes that the error was harmless.

### a. Whether Robbery Under the Hobbs Act Requires The Specific Intent To Deprive Another Of His Or Her Property Permanently

Defendants claim that although the Hobbs Act's definition of robbery does not mention specific intent, the statute nevertheless requires it.[4] Defendants note that Congress took the Hobbs Act's definition almost verbatim from the New York robbery statute.[5] Defendants argue that because New York courts had construed the New York statute to require specific intent to deprive another of his property permanently, *e.g., People v. Koerber*, 244 N.Y. 147, 155 N.E. 79, 82 (1926), the Hobbs Act also requires specific intent.

As discussed below, principles of statutory construction, the legislative history of the Hobbs Act, and case law compel the conclusion that the Hobbs Act's definition of robbery incorporates New York's requirement of specific intent.[6]

Also, Representative Walter stated "that [the] definition [in the Hobbs Act] is the definition of robbery contained in the New York Code." *Id.* at 11,842.

6. At first glance, the Hobbs Act's definition of robbery seems clear on its face. If it is clear, then resort to legislative history or other interpretive aids may be impermissible. *Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 280 n. 4 (9th Cir. 1989); *see generally* Norman J. Singer, *Sutherland: Statutes and Statutory Construction* § 46.04 (5th ed.1992).

However, on closer analysis the statute is not as clear as it first seems. The word "unlawful" is undefined and could include a requirement of mens rea. In addition, the fact that different courts have reached different conclusions on whether a Hobbs Act robbery requires specific intent is evidence of the statute's ambiguity. *Marathon LeTourneau Co. v. NLRB*, 414 F.Supp. 1074, 1080 (S.D.Miss.1976); *compare United States v. Thomas*, 8 F.3d 1552, 1562–63 (11th Cir.1993) (refusing to require specific intent) *with United States v. Nedley*, 255 F.2d 350 (3d Cir.1958) (requiring specific intent).

Moreover, even if the statutory language is clear in and of itself, the question remains of whether it is complete. In light of the fact that it contains no mens rea element whatsoever for a grave felony, a serious question exists as to its completeness. Construing the statutory lan-

### i. Principles Of Statutory Construction Create A Presumption That The Hobbs Act Incorporates New York's Requirement Of Specific Intent

■ The Third Circuit confronted this precise issue in *United States v. Nedley*, 255 F.2d 350 (3d Cir.1958). The Third Circuit noted:

> "Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

*Id.* at 357 (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952)). The Third Circuit applied this reasoning to conclude that because Congress had used the New York statutory definition of robbery and had not indicated that specific intent was not an element, a Hobbs Act robbery requires specific intent.

This approach accords with the approach the Ninth Circuit took in a closely analogous case. In *United States v. Aguon*, 851 F.2d 1158, 1162–67 (9th Cir.1988) (en banc), the Ninth Circuit decided whether a conviction for extortion under the Hobbs Act requires proof of "inducement." The Ninth Circuit explained that Congress had taken the Hobbs Act's definition of extortion from the New York Code, and that in construing the state statute, New York courts had required proof of inducement. The Ninth Circuit echoed *Nedley* by stating:

> It is a well-established principle of statutory construction that when one jurisdiction adopts the statute of another jurisdiction as its own, there is a presumption that the construction placed upon the borrowed statute by the courts of the original jurisdiction is adopted along with the statute and treated as incorporated therein.

*Id.* at 1164 (citing *Tucker v. Oxley*, 9 U.S. (5 Cranch) 34, 42, 3 L.Ed. 29 (1809)). The Ninth Circuit followed this principle to conclude that Congress had adopted the New York courts' interpretation of extortion when it borrowed the New York statutory definition, and so a conviction for extortion under the Hobbs Act requires proof of inducement.[7]

Applying the principles of statutory construction articulated in *Nedley* and *Aguon* to the instant case, the proper outcome becomes

---

guage to make robbery a strict liability offense might work an absurd result never envisioned by Congress. Even commentators who generally oppose interpretive aids, such as Justice Scalia, admit that resort to extrinsic sources is permissible "to verify that what seems to [the court] an unthinkable disposition ... was indeed unthought of." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring); *see also* Note, *Why Learned Hand Would Never Consult Legislative History Today*, 105 Harv. L.Rev. 1005, 1005–06 (1992) (discussing Justice Scalia's "plain meaning" approach to statutory interpretation).

Thus, although the Hobbs Act's definition of robbery seems facially clear at first glance, a closer analysis reveals this not to be the case. "When aid to construction ... is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. Culbert*, 435 U.S. 371, 374 n. 4, 98 S.Ct. 1112, 1115 n. 4, 55 L.Ed.2d 349 (1978) (quoting *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)).

7. The Supreme Court later disagreed with the Ninth Circuit's conclusion on this issue. *Evans v. United States*, 504 U.S. 255, 260–66, 112 S.Ct. 1881, 1885–88, 119 L.Ed.2d 57 (1992). In doing so, however, the Supreme Court reaffirmed the principles of statutory construction the Ninth Circuit followed and specifically noted that Congress had taken the Hobbs Act's definition of extortion substantially from the New York Code. *Id.* The Supreme Court found, however, that "the New York statute ... makes clear that extortion could be committed [without inducement]." *Id.* at 264–65, 112 S.Ct. at 1887. The Court found that the Hobbs Act's legislative history's "reference to New York law is consistent with an intent to apply the common-law definition [of extortion, which does not require inducement]." *Id.* at 264, 112 S.Ct. at 1887. Thus, although the Supreme Court has overruled *Aguon*'s holding that proof of inducement is required, it has reaffirmed *Aguon*'s reasoning insofar as it is relevant to the case at bar. The Supreme Court merely disagreed with the Ninth Circuit that New York law required proof of inducement.

clear. The legislative history of the Hobbs Act indicates that Congress took its definition of robbery from the New York statute. Congress manifested no intention to alter that definition substantially. Thus, a presumption exists that Congress intended to incorporate New York's interpretation of its robbery statute, which includes a requirement of specific intent. *See Aguon,* 851 F.2d at 1164; *see also* Justice Felix Frankfurter, *Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 537 (1947) (stating that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it").

### ii. The Legislative History Of The Hobbs Act Confirms The Presumption That The Hobbs Act Incorporates New York's Requirement Of Specific Intent

The accuracy of this presumption becomes apparent when one analyzes the legislative history of the Hobbs Act. During House debates on the bill, Representative Hobbs stated that "there is nothing clearer than the definition of robbery and extortion in this bill. They have been construed by the Courts not once, but a thousand times." 91 Cong.Rec. 11,900 (1945). For this reason, Representative Hobbs stated that "[e]verybody knows that [the definitions] mean." *Id.* at 11,912.

Obviously, if Congress had redefined robbery by eliminating the requirement of specific intent, then no court would yet have construed the Hobbs Act's definition. It would have been disingenuous at best to claim that the courts had construed it "a thousand times" or that "everybody knows what [the definition] means[s]." Representative Hobbs' statements thus indicate that one should look to judicial constructions of the state statute to interpret the Hobbs Act's definition of robbery.

Moreover, Representative Michener stated: "[T]here has been and will be so much talk about what constituted robbery and extortion and it is well to remember that the New York definitions are being used in this bill." *Id.* at 11,843. Representative Michener's statement indicates that, to ascertain the

meaning of robbery under the Hobbs Act, one should look to New York law. However, because the New York statute was virtually identical to the Hobbs Act's definition, looking to the state statute's text would not help someone interpret the federal statute. Therefore, Representative Michener's statement must mean that one should look to judicial constructions of the state statute to interpret the Hobbs Act's definition of robbery.

In sum, principles of statutory construction create a presumption that Congress intended to incorporate judicial constructions of New York's robbery statute into the Hobbs Act. The legislative history of the Hobbs Act confirms the accuracy of that presumption. Additionally, as discussed below, case law leads to the same conclusion.

### iii. Case Law Compels The Conclusion That The Hobbs Act Requires Specific Intent

In addition to holding that a Hobbs Act extortion requires inducement, the Ninth Circuit held in *Aguon* that it requires specific intent, despite the statute's failure to mention mens rea. The government argues, however, that *Aguon* is not controlling. The government notes that *Aguon* dealt only with whether specific intent is an element of a Hobbs Act extortion, and did not address whether the Hobbs Act requires specific intent for robbery. The government notes that extortion, unlike robbery, involves taking property with the owner's consent. Therefore, the government argues, proof of an evil motive is necessary in extortion cases in order not to convict individuals who believed they were acting innocently, but such proof is not as important in robbery cases.

However true all this may be, it does not compel the conclusion that *Aguon* does not apply to the case at bar. *Aguon*'s reasoning sweeps broadly; in addition to articulating venerable principles of statutory construction, the Ninth Circuit bottomed its opinion on the fundamental requirement of mens rea in Anglo–American jurisprudence:

> [This] regular requirement of Anglo–American criminal law [is] "no provincial or transient notion." Invoking William

Blackstone, Roscoe Pound and Max Radin, and writing for the [Supreme] Court [in *Morissette v. United States* ], Justice Jackson found mens rea a cornerstone of our criminal jurisprudence. As he observed, the "intense individualism" of Americans had set this element deep within our criminal law. Justice Jackson drew the clear corollary: the question of intent must be submitted to the jury.

*Aguon,* 851 F.2d at 1168 (citations omitted). On this basis, the Ninth Circuit broadly held that "[n]o act standing alone is a crime under the Hobbs Act. A guilty mind has to be proved as well as a wrongful deed." *Id.* This reasoning applies equally to the case at bar.

Unsuccessful in its attempt to distinguish *Aguon,* the government next claims that *Nedley* was wrongly decided. The government relies on *United States v. Thomas,* 8 F.3d 1552 (11th Cir.1993), which held that robbery does not require specific intent under the Hobbs Act. An analysis of Thomas reveals that it contains no reasoning of its own on this issue. Rather, it merely stated its conclusion after quoting extensively from the Supreme Court's opinion in *United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), which the government also cites.

In *Culbert,* the Supreme Court addressed whether the Hobbs Act's definition of extortion requires proof of racketeering. The Supreme Court stated:

Nothing on the face of the statute suggests a congressional intent to limit its coverage to persons who have engaged in "racketeering." To the contrary, the statutory language sweeps within it all persons who have "in any way or degree ... affect[ed] commerce by robbery or extortion." These words do not lend themselves to restrictive interpretation; as we have recognized, they "manifest ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." The statute, moreover, carefully defines its key terms, such as "robbery" ...

*Id.* at 373, 98 S.Ct. at 1113 (citations omitted).

Read broadly and superficially, this language would seem to support the government's position. On closer analysis, however, *Culbert* (and therefore *Thomas* ) offers the government little help, for several reasons.

First, the quoted language merely expresses the unexceptional proposition that the statute criminalizes all activity that falls within its language. All criminal statutes seek to do this, and many attempt to define their key terms. This may prohibit courts from grafting a highly specific, additional element onto a statute, such as proof of racketeering. However, it generally does not prohibit courts from requiring a mens rea element where one does not appear from the face of the statute. Courts regularly require proof of mens rea in such cases. *E.g., Aguon,* 851 F.2d at 1168.

Second, the *Culbert* Court did not confront the issue of whether the Hobbs Act requires mens rea, or what that mens rea might be. It is highly implausible that the *Culbert* Court intended to foreclose any possibility of requiring a mens rea for robbery or extortion. Such a holding would make such crimes (punishable by years in prison) strict liability offenses. Yet that is what the government's hyper-literal reading of *Culbert* would require.[8] Clearly then, the Supreme Court did not intend the above-quoted language to offer guidance on the issue of mens rea.

Third, other language in *Culbert* cuts sharply against the government's argument. The Court stated that "there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law.... [C]onduct punishable under the Hobbs Act was *already punishable* under state robbery and extortion statutes." *Id.* at 379, 98 S.Ct. at 1117 (emphasis added). Thus, *Culbert* indicates that Congress intended to criminalize only those robberies that

---

**8.** It is equally unrealistic to attribute such an intention to Congress where the legislative history evinces no such intention and in fact is to the contrary.

the states already punished—robberies that involved specific intent.[9]

For all these reasons, *Culbert* (and therefore *Thomas* ) does not compel the conclusion that specific intent is not an element. To the extent that *Culbert* offers any guidance at all, it leads to the opposite conclusion.[10]

In short, case law, legislative history, and principles of statutory construction lead to the same conclusion: Conviction for robbery under the Hobbs Act requires proof of the specific intent to deprive another of his or her property permanently. Because the Court did not instruct the jury on this element (either in the instructions for the substantive robbery offense or elsewhere), the Court erred.[11] Accordingly, the Court now turns to the issue of the appropriate standard of review to apply to the error.

### b. The Proper Standard Of Review To Apply To The Error

Determining the appropriate standard of review requires ascertaining whether Defendants objected to the error. If they objected, then harmless-error analysis will apply (although Defendants argue that the Court must grant a new trial without resort to harmless-error analysis). If they did not object, then the Court must apply the more stringent plain-error analysis. *Johnson v. United States*, —— U.S. ——, ——, 117 S.Ct. 1544, 1548, 137 L.Ed.2d 718 (1997); *United States v. Klinger*, 128 F.3d 705 (9th Cir.1997) (applying plain-error analysis to a faulty jury instruction to which the defendant had failed to object).

### i. Whether Defendants Objected

■ Rule 30 of the Federal Rules of Criminal Procedure provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto ..., stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Crim.P. 30. Despite this requirement of a specific, clear objection, courts do not "expect some sort of ritualistic incantation from trial lawyers to make an effective objection; [courts merely] expect plain talk sufficient to direct the presiding officer's attention to the existence of an objection and to the specific ground that underlies the objection." *United States v. Madruga*, 810 F.2d 1010, 1014 (11th Cir.1987). Thus, "[i]t suffices that the [party] raise[s] the issues so that the court understands what they are." *Lyons v. National Car Rental Sys., Inc.*, 30 F.3d 240, 243 (1st Cir.1994).[12]

■ Applying these principles to the case at bar, it is evident that Defendants adequately articulated their objection. In her proposed jury instruction on conspiracy, Defendant Yolanda Capati[13] proposed the following element: "The defendant must have the requisite *intent* of committing the underlying offense of robbery of jewelry stores." (Def. Yolanda Capati's Proposed Supplemental Jury Instructions at 2 (emphasis added)). Immediately after this proposed language, the following commentary appeared: "In *United States v. Aguon*, ... the Ninth Circuit required a reversal on the conspiracy conviction because the trial court failed to instruct on *specific intent*." (*Id.* (emphasis added)).

**9.** Congress apparently decided to criminalize acts that the states already criminalized because "the States had not been effectively prosecuting robbery and extortion affecting interstate commerce and [Congress believed that] the Federal Government had an obligation to do so." *Culbert*, 435 U.S. at 380, 98 S.Ct. at 1117.

**10.** The Ninth Circuit decided *Aguon* long after the Supreme Court had decided *Culbert*. However, *Aguon* does not cite *Culbert* or discuss its implications. Perhaps it simply did not occur to the Ninth Circuit that *Culbert* could be stretched so far so as to eliminate the requirement of specific intent, or for that matter, any mens rea requirement for a serious felony. In any event, the Ninth Circuit apparently did not feel itself

bound by *Culbert* on an issue that is virtually identical to the one confronting this Court today.

**11.** If this error was not harmless, it will invalidate Defendants' convictions for conspiracy and aiding and abetting. *United States v. Kim*, 65 F.3d 123, 126 (9th Cir.1995).

**12.** The standard for a proper objection is the same under Federal Rule of Criminal Procedure 30 and its civil counterpart, Federal Rule of Civil Procedure 51. *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir.1989).

**13.** Each Defendant joined in the objections of the other. (Tr. at 1861.)

Moreover, a dialogue during a conference on the jury instructions supplemented this language. Specifically, after *Aguon* was mentioned again, (Tr. at 1889–90), the following exchange took place:

> THE COURT: ... I think robbery, you don't need any specific intent to rob.
>
> MR. JONES: [14] That's correct, your honor. We have a definition for robbery that we have submitted. I believe it has been agreed to....
>
> MR. BOYCE: [15] I believe robbery requires a specific intent to steal, your honor.

(*Id.* at 1193–94.)

This dialogue reveals that Defendants adequately articulated their objection. Mr. Boyce's comment manifests disagreement with the Court, the government, and the jointly submitted instruction. It advised the Court that robbery requires specific intent. Moreover, Defendants' papers referenced *Aguon*, which is the most pertinent Ninth Circuit case on the issue. In light of this, the Court cannot conclude that Defendants failed to advise the Court specifically of their contention and the basis for it.

■ A counterargument exists however: None of Defendants' objections occurred in the context of discussing the substantive robbery instruction. Rather, Defendants' proposed instruction and the objection voiced in court all related to an element Defendants wanted to add to the *conspiracy* instruction. This would not have changed the substantive robbery instruction. Arguably, then, Defendants objected to the conspiracy instruction, not the robbery instruction.

This argument lacks merit for two reasons. First, regardless of the broader context, Mr. Boyce's in-court objection related directly to the substantive robbery instruction. After the government's attorney stated that the parties had agreed on the robbery definition, Mr. Boyce immediately responded that robbery requires specific intent. (*Id.* at 1194.) Thus, although the larger context may have related to the conspiracy instruction, Mr.

Boyce's comment directly related to the substance of the robbery instruction itself.

Second, even if the objection had not followed on the heels of Mr. Jones' statement about the substantive robbery instruction, that fact would be of no moment; the objection still advised the Court of Defendants' position and the basis for it.

> [The requirement of a specific objection] should not be employed woodenly.... If it be applied blindly and without the benefit of analysis of particular fact situations before individual courts in specific cases it will be transformed from a sound principle of judicial administration into a trap for the unwary, a trap reminiscent of the senseless technicalities that characterized common law procedural systems and which made them a source of scorn and anger to many lawyers and to most laymen.

*United States v. Currens,* 290 F.2d 751, 759 (3d Cir.1961).

The Court will not find that a specific objection that related to the substance of the definition of robbery and that referenced the most relevant Ninth Circuit case on the issue is inadequate, merely because it arguably occurred in the wrong context. Defendants adequately advised the Court of the nature of their objection. That is sufficient. *Madruga,* 810 F.2d at 1014.

For the foregoing reasons, the Court finds that Defendants objected to the Court's failure to instruct the jury on specific intent, which means that plain-error analysis does not apply. Accordingly, the Court must apply harmless-error analysis. First, however, the Court must address Defendants' argument that the Court must grant a new trial without resort to harmless-error analysis.

#### ii. Whether Harmless–Error Analysis Applies

Defendants argue that failing to instruct on an element of the offense is "structural error" that defies harmless-error analysis and is thus reversible per se. Defendants are incorrect.

---

**14.** Randy K. Jones is the Assistant United States Attorney assigned to the case.

**15.** Robert E. Boyce is the attorney for Defendant Capati.

■ The Ninth Circuit has held that if a district court removes an element of the offense from the jury's consideration, i.e., instructs the jury that the element is satisfied as a matter of law, then reversal is always required. *United States v. Gaudin*, 28 F.3d 943, 951 (9th Cir.1994) (en banc), *aff'd*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). Reversal is required because, as a matter of logic, a reviewing court cannot subject such an error to harmless-error analysis. Harmless-error analysis cannot be applied because that analysis asks whether the verdict "was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). If a jury was precluded from considering an element, then it did not render a proper verdict at all, and "[t]he question whether the *same* verdict ... would have been rendered absent the constitutional error is utterly meaningless." *Id.* at 280, 113 S.Ct. at 2082. Thus, "[t]here is no *object*, so to speak, upon which harmless-error scrutiny can operate." *Id.*

■ Defendants and some panels of the Ninth Circuit have extended this logic to cases where the court completely *fails to instruct* the jury on an element, rather than where a court instructs the jury that the element is satisfied as a matter of law. *See, e.g., United States v. Hove*, 52 F.3d 233, 235–36 (9th Cir.1995); *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir.1994). More recently, however, the Ninth Circuit, sitting en banc, disapproved of these cases. *Roy v. Gomez*, 81 F.3d 863, 867 n. 3 (9th Cir.1996), *vacated on other grounds sub nom. California v. Roy*, ─── U.S. ───, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996). The Ninth Circuit explained:

> The error [of removing an element of the offense from the jury's consideration] differs in a crucial respect from omission of an element of the crime from jury instructions. When a court instructs the jury that an element of the crime has been established as a matter of law, proof of that element of the crime is removed from the jury's purview. Failure to mention an element of the crime, in contrast, does not "completely remove" from the jury's con-

sideration the evidence relating to that element; it simply fails to alert the jurors they must consider it. Even though an element of the offense is not specifically mentioned, it remains possible the jury made the necessary finding. Review for harmless error is appropriate....

*Id.* at 866–67.

Accordingly, the Court rejects Defendants' argument that it must grant a new trial without resort to harmless-error analysis. The Court now turns to the issue of whether the error was harmless.

### c. Whether The Error Was Harmless

■ In determining whether failing to instruct on an element of the offense is harmless, the Court applies the analysis articulated in Justice Scalia's concurring opinion in *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989). *United States v. Lopez*, 100 F.3d 98, 103–04 (9th Cir.1996), *cert. denied*, ─── U.S. ───, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997); *Martinez v. Borg*, 937 F.2d 422, 424–25 (9th Cir.1991). In *Carella*, Justice Scalia discussed the manner in which a reviewing court must analyze a jury instruction that contains an unconstitutional presumption. Justice Scalia explained:

> When the facts necessarily found by the jury are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the elements required to be presumed. The error is harmless because it is "beyond a reasonable doubt" that the jury found the facts necessary to support the conviction.

*Carella*, 491 U.S. at 271, 109 S.Ct. at 2424 (Scalia, J., concurring).

■ Applying this reasoning to a case where the district court fails to instruct the jury on an element of the offense, a reviewing court must "treat[ ] the omitted element as the 'presumed fact' and consider[ ] whether a rational jury could have found the remaining elements of the offense without also finding the omitted element." *Roy*, 81 F.3d at 866. Thus, this Court must decide whether a rational jury could have found the facts that the jury found without also finding that

Defendants intended to deprive another of his or her property permanently.

■ Under this standard of review, the harmlessness of the error becomes apparent. In convicting Defendants of conspiracy, the jury had to have found that Defendants conspired (1) to take or obtain the victim's personal property; (2) against the victim's will; (3) by means of force or fear of injury. In the context of this case, this means that the jury found that Defendants conspired to use force or fear to take property from jewelry stores. Given the evidence at trial, no rational jury could have found these facts without also concluding that Defendants intended to deprive the owners of the property permanently. Thus, the error was harmless.[16]

### d. Conclusion

In sum, the Court concludes that it erred by not instructing the jury that specific intent to deprive another of his or her property permanently is an element of robbery under the Hobbs Act. Defendants objected to this error, which means that harmless-error analysis applies. Applying this standard, the Court concludes that the error was harmless.

### 2. Co-conspirator Statements

■ During the trial, the Court admitted portions of several conversations between Defendants and the Government's cooperating witness, Angel Reyes. The statements of each Defendant were admitted against the other under the co-conspirator statement exception to the hearsay rule. Defendants argue that the statements were erroneously admitted and that the admission of the statements was prejudicial. For the reasons set forth in this Court's order filed September 18, 1996, Defendants' argument is rejected. As Defendants correctly observe, the conspiracies at issue in the cases relied upon by the Court in the prior order were general conspiracies, rather than conspiracies to commit a Hobbs Act robbery. However, as pointed out in the prior order, an overt act need not be criminal in order for it to be in furtherance of a conspiracy. *See, e.g., United States v. Zemek,* 634 F.2d 1159, 1173 n. 18 (9th Cir.1980). Hence, while the division of proceeds may not have been a criminal act, the conduct was nevertheless within the scope of the conspiracy. *See United States v. Cruz,* 127 F.3d 791 (9th Cir.1997) (stating that "a conspiracy may continue when payment is sought for already-delivered contraband.... ")

### 3. Unanimity And Multiplicity Instructions

■ Defendant Redondo argues that a new trial is required because the Court refused to give his proposed unanimity and multiple conspiracy instructions. In the absence of such instructions, Redondo argues, the jury could have been under the misapprehension that Defendants could be found guilty of a conspiracy to commit robbery based primarily on the evidence that Defendants received and sold stolen goods.

Where jury instructions are challenged, the Court reviews the instructions as a whole and the adequacy of the charge is evaluated in the context of the trial. *United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986).

Reviewing the instructions as a whole, there is no merit to the assertion that the jury might have erroneously convicted Defendants due to the receipt and sale of stolen goods. The jury was instructed specifically on this point: "The fact that a defendant may have agreed to receive, possess, conceal or sell stolen property ... is not in and of itself sufficient for you to find that defendant guilty of any of the offenses charged in the indictment." (Court's Instruction No. 35.) Moreover, the jury was instructed clearly

---

**16.** Of course, one can imagine scenarios in which Defendants committed all the acts that the jury found that they committed, but did not intend to deprive the owners permanently of their property. For example, Defendants conceivably could have been under the delusion that the property belonged to them. Alternatively, Defendants could have intended to one day return the property. However, no evidence suggests that these scenarios or any like them took place; given the evidence at trial, such suggestions are unrealistic. An "implausible factual scenario" that makes it "theoretically possible" that the jury did not find the omitted element does not suffice. *Lopez,* 100 F.3d at 105.

that only the robberies, not the grab-and-run thefts, could form the bases for the Hobbs Act counts: " 'Snatch-and-grabs' or 'grab-and-runs' are not robberies under the law." (Court's Instruction No. 28.). Finally, there can be no suggestion that the jury was under the impression that verdicts of guilty could be returned if different jurors found that different crimes were involved in the conspiracy: "You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit." (Court's Instruction No. 24.)

In sum, Redondo's proposed unanimity and multiplicity instructions were repetitive of the instructions given, and were thus properly refused.

### 4. Prosecutor's Statement During Closing Argument

 Defendant Redondo argues that a new trial is required because the prosecutor, in violation of Redondo's Fifth Amendment rights, impermissibly commented upon Redondo's failure to testify.

"A prosecutor's comment regarding a defendant's failure to testify at trial violates the Fifth Amendment." *United States v. Tarazon*, 989 F.2d 1045, 1051 (9th Cir.) (citing *Griffin v. State of California*, 380 U.S. 609, 611–12, 85 S.Ct. 1229, 1231, 14 L.Ed.2d 106 (1965)), *cert. denied*, 510 U.S. 853, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993). In *Tarazon*, the Ninth Circuit summarized the test to determine whether a conviction must be set aside due to an impermissible comment on a defendant's failure to testify:

> Prosecutorial comment on the defendant's failure to testify mandates reversal where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for conviction, and where the evidence could have supported acquittal. Moreover, reversal is only required if the comment could have affected the verdict. We will not reverse when a prosecutorial comment is a single, isolated incident, does not stress an inference of guilt

from silence as the basis of conviction, and is followed by a curative instruction.

*Tarazon*, 989 F.2d at 1052.

In full context, the prosecutor's comment was as follows:

> Jeffrey Todd Diaz would take the jewelry to the recruiting station, and sometimes he would go with Joe Perez, his buddy, his army buddy, or sometimes he would go with his brother; the two people out of all these other people that he really could trust.
>
> He didn't want them to know what was going on per se, because he didn't want to instigate [sic] them. If they were ever caught or ever he was caught doing these crimes, he wanted to insulate them, so he didn't tell them everything.
>
> In fact, when they went to the jewelry store to get rid—went to the recruiting station or to the M.E.P.C. station or to his house in La Mesa, wherever they went to get rid of the jewelry, he would go—meaning Jeff—would go into the room with Capati, or with Redondo, or with Capati and Redondo. And Joe Perez would stay outside in the waiting area. Jason would stay outside in the waiting are[a].
>
> They didn't know what the conversations were about in those back rooms, but they did know, particularly Joe Perez after the robbery, he knew, he testified that they took the jewelry over there in a bag. Jeff met with Capati or Redondo, or Capati and Redondo. They would meet. He'd come out of the room. He did not have any jewelry with him when he came out of the room. That's a fact. That's a fact. That happened on several different occasions.
>
> When you look at all of the testimony, when you look at the testimony of Jeffrey Todd Diaz—and I'm going to talk to you about that a minute because the defense, I'm sure, is going to get up here and tell you that he's a lying you know what. He made this up. He was trying to save his butt. He didn't want to go to jail in the federal system.
>
> I'm going to talk to you a little bit about that, because my response right now is that who knows best about what happened in a criminal situation than the criminals

themselves. The only people that could tell you what happened is Capati, Redondo, Yolanda Capati, and the robbers in this case. I'm not saying—

(Tr. at 1950–51.)

Viewed in isolation, the last paragraph of the prosecutor's above-quoted remarks could create the inference that Defendants' guilt may be inferred from their failure to testify as to what really was said during those "back room" discussions.[17] Creating such an inference is not proper. But we will never know what the prosecutor was "not saying" by his remarks. Equally likely, perhaps even more likely, the prosecutor was simply attempting to bolster the credibility of Diaz's testimony by highlighting the fact that Diaz, as one of "the robbers in this case," was one of the participants in the negotiations. The context bears this out because the potentially improper comment came on the heels of the prosecutor's acknowledgement that the other robbers had no knowledge of the discussions with Defendants. Moreover, the remarks tie in to the prosecutor's examination of Diaz when the fact came to light that Diaz intentionally prevented the other robbers from becoming involved in the discussions with Defendants. (Tr. at 489.)

In any event, even assuming that the prosecutor was indeed commenting on Redondo's failure to testify, a new trial is not required on that ground. The comment was a single, isolated incident during a very lengthy closing argument, did not stress silence as a basis for guilt, and the Court immediately instructed the jury to disregard the comment. In the final charge, the Court again instructed the jury that a criminal defendant is not compelled to testify and that no inference of guilt can be drawn from a defendant's failure to testify. For these reasons, the prosecutor's statements during closing argument do not warrant a new trial.

### 5. Weight Of The Evidence

Defendants' final argument in support of their motion for a new trial is that the evidence in this case preponderates so heavily

against the verdict that it would be manifestly unjust to allow the convictions to stand.

#### a. Legal Standard

Under Fed.R.Crim.P. 33, a district court may grant a new trial "if required in the interest of justice." "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir.1992). It has been said on occasion that the court, when called upon to question the jury's resolution of conflicting evidence, sits as a "thirteenth juror". *See Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982). Perhaps this designation derives from the fact that " '[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of witnesses.' " *A. Lanoy Alston*, 974 F.2d at 1211 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)). But despite the label, it is clear that the court does not act as a "thirteenth juror" in the sense that a new trial should be granted whenever the court happens to disagree with the conclusion of twelve jurors that the government has proved its case beyond a reasonable doubt. Instead, the motion should be granted only in "exceptional cases". *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir.1981). Combining these principles, the test is stated as follows: " 'If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.' " *Id.* at 1211–12 (quoting *Lincoln*, 630 F.2d at 1319).

#### b. Analysis

Before analyzing the evidence, it is important to identify both the critical issues and the non-issues in this case. There has never been any dispute that Defendants pur-

---

**17.** Alberto Capati did testify regarding his dealings with Diaz. The remarks, therefore, were

certainly not intended to create an inference of guilt due to Capati's silence.

chased stolen jewelry from Diaz and that Defendants sold some of the stolen merchandise to others. The parties agreed, and the jury was instructed, however, that receiving and selling stolen goods do not, as a matter of law, constitute either a Hobbs Act conspiracy or a Hobbs Act robbery.

There is also no question whether the grab-and-runs and the robberies actually occurred. At the same time, however, the evidence shows unequivocally that Diaz was the person who planned the robberies in every respect and made all decisions regarding the location of the robberies, the timing of the robberies, and the hiring of the other participants. As set forth at length above, the other principals in the robberies had minimal, and in may cases no, knowledge or awareness of Defendant's alleged involvement with Diaz.

There is an evidentiary conflict regarding the initial arrangement between Capati and Diaz. According to Capati, he initially understood that Diaz would be obtaining jewelry from Diaz's uncle. Diaz, on the other hand, alleged that the initial meeting with Capati resulted in an agreement that grab-and-runs would be committed. But even if Diaz's version is taken as true, it must be remembered that the grab-and-runs do not constitute robberies under the law. The jury was so instructed.

So what evidence was there that Defendants conspired with Diaz or induced Diaz to commit the actual robberies? The only evidence of such an agreement is Diaz's testimony regarding the alleged meeting after the January 1992 Jessop's grab-and-run.[18] On this point, the Court has scoured the record, reviewed notes from the trial, and heard extensive argument. After all of this, the Court can reach but one conclusion—that the heavy preponderance of the evidence demon-strates that the meeting could not have occurred.

As cited above, Diaz averred that the meeting took place within a few days after the January 16 grab-and-run. The undisputed exhibits, however, establish that Capati, without question, could not have had such a meeting because he was out of the state during the period in which the meeting could have occurred. Admitted into evidence is a receipt signed by Capati and dated January 19, 1992, from University Exxon in Flagstaff, Arizona showing repairs done to Capati's car. (Def's Ex. JJ.) The trip to the Grand Canyon was further corroborated by photographs showing Capati with his family at the Grand Canyon and several receipts from the Grand Canyon dated January 19, 1992. (Def's Ex. PP–1 through PP–6.) In addition, two photographs and two receipts demonstrate that the Capati family was in Lake Havasu City on January 21, 1992. (Def's Ex. RR–1 through RR–4.) Moreover, Capati's testimony that he was at the Grand Canyon and Lake Havasu at the time was corroborated by the unimpeached testimony of two of Capati's children, and the military leave records introduced through former army recruiter Robert Snead. (Tr. at 1477–80.)

If Diaz fabricated the most crucial part of his testimony, it is difficult to imagine what aspect of Diaz's testimony can be believed. There is the familiar legal maxim, *falsus in uno, falsus in omnibus.* While not a command, the doctrine that a witness who is shown to have testified falsely in one regard may be considered unworthy of belief as to the whole of his testimony has particular application in this case. From the outset, Diaz was not credible. Diaz testified for the government in exchange for a grant of federal immunity for himself and his brother Jason and in exchange for a transfer from

---

18. Castro testified that when he was in the presence of Capati and Diaz, "Capati asked [Diaz] if [Castro and Diaz] were going to go out and do some robberies that night. And [Capati]—that's when he seemed kind of nervous." (Tr. at 801.) This statement proves nothing. A mere inquiry does not ratify, induce, or otherwise encourage illegal activity. It certainly does not *agree* to illegal activity. Moreover, Castro merely stated that Capati "asked," and did not indicate the manner in which he asked. Capati could have said, in a discouraging and horrified tone, "You aren't going to do any robberies tonight, are you?" Capati's nervousness could have been attributable to a reluctance to see robberies committed. At best, Castro's statement is equivocal and insufficient to allay the Court's concerns about the weight of the evidence.

federal to state prison.[19] Of course, if all witnesses who testify in exchange for favorable treatment from the government were flatly discredited by the courts, prisons all throughout the land would be substantially less populated. But here, Diaz even lied to the jury about his agreement with the Government. (Tr. at 103–04, 150.) With these falsehoods setting the general tenor, the Court, both during the trial and when reviewing the transcripts, had a powerful impression that everything Diaz said was precisely what he thought the Government wanted him to say, true or false.

The Court is not alone in the conviction that Diaz is not to be believed. More than one of his admitted accomplices portrayed Diaz as a liar, and a law enforcement official, who once secured Diaz as an informant, characterized Diaz as unreliable, testifying that the information supplied by Diaz was "either part truths or lies." (Tr. at 1453.) Even Diaz himself admitted numerous lies regarding the facts of this case. (Tr. at 319–21.)

As set forth above, the only evidence from which the Defendants' criminal participation in the robberies could be established came from Diaz and Diaz's testimony is demonstrably false, particularly with respect to the pivotal agreement alleged to have been made. In light of these circumstances, the Court is left with the strong belief that if the guilty verdicts are permitted to stand against the heavy preponderance of evidence to the contrary, a serious miscarriage of justice may occur. This is an exceptional case. It is the first time that the Court has intervened after a jury's verdict of guilt. The Court must do so now and submit the issues in this case for determination by another jury.[20]

Finally, the Court would be remiss if no comment were made on the able and skillful duty performed by the Assistant United States Attorney. The Court's holding in no way reflects negatively upon him. The Government's attorney persuasively, and honestly, weaved together a theory of this case that held its force until the end. But the theory, based so heavily on the incredible testimony of one witness, can in the end be no better than the discredited witness who gave it birth.

## IV. Conclusion

For the reasons set forth above, Defendants' motions for a judgment of acquittal are denied. Defendant's motions for a new trial are granted.

IT IS SO ORDERED.

---

**19.** Diaz was convicted in state court for six of the robberies that relate to the issues in this case. Ironically, Diaz is due to be released from prison this year.

**20.** Ninth Circuit law requires that it be an "exceptional case" before the Court can grant a new trial. *Pimentel*, 654 F.2d at 545. The Seventh Circuit requires even more: In the Seventh Circuit a district court cannot grant a new trial unless the evidence was contrary to the "physical laws of nature." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir.1995) (quoting *United States v. Kuzniar*, 881 F.2d 466, 471 n. 1 (7th Cir.1989)). Even this stringent standard is satisfied here: Capati could not have met with Diaz in California if Capati was in Arizona at the time.